UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK MELLON,
as Trustee, and UNICREDIT BANK AG

                 Plaintiffs,

against

TEXTRON BUSINESS SERVICES, INC.

                 Defendant.

**11 CIV 4865**

Civil Action No.

JUL 14 2011

U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

      Plaintiffs, The Bank of New York Mellon ("BNYM"), a banking corporation organized and existing under the laws of the state of New York, solely in its capacity as Trustee under the Indenture described herein, and UniCredit Bank AG, New York Branch ("UCI"), as and for their Complaint against the Defendant herein, state and allege as follows:

### Preliminary Statement

      1.     This case arises out of Defendant's role as Servicer in the collapse, in a welter of fraud, of the business of Brooke Corporation ("Brooke Corp."), Brooke Capital Corporation ("Brooke Capital") and Aleritas Capital Corporation (f/k/a Brooke Credit Corporation) ("Aleritas") (collectively with their affiliates and subsidiaries, the "Brooke Entities"). The Brooke Entities operated an insurance agency franchise business, with hundreds of franchisee brokerage companies operating throughout the country.

      2.     The Brooke Entities' business involved providing financing to franchisees for the purchase of agency businesses and operating capital. Aleritas, the Brooke Entities' financing arm, made loans to insurance agency franchisees ("Borrower-Franchisees"). Aleritas then bundled the loans and sold the loans to bankruptcy remote vehicles. These bankruptcy remote

vehicles ("Issuers") included Brooke Securitization Company 2006-1, LLC (the "2006-1 Issuer").  The 2006-1 Issuer issued notes to investors.  The proceeds from those notes were used to pay for certain loans (the "Loans") purchased from Aleritas.  Loan payments by Borrower-Franchisees fund the payment of principal and interest on the notes.

3.      In fact, the Brooke Entities, including Aleritas, were engaged in what the United States Securities and Exchange Commission ("SEC") has called "a massive financial fraud."  According to the SEC, senior management of the Brooke Entities "engaged in various undisclosed schemes to meet almost weekly liquidity crises."  On May 4, 2011, the SEC filed a fifty-five page complaint in the United States District Court for the District of Kansas (the "SEC Complaint") detailing the fraudulent activities of the Brooke Entities, which is attached hereto as Exhibit 1 and incorporated herein by reference.

4.      Defendant Textron Business Services, Inc. ("TBS") is the Servicer of the Loans at issue in this case under a Sale and Servicing Agreement dated as of July 1, 2006 (the "2006-1 SSA") with respect to the 2006-1 Issuer.  A copy of the 2006-1 SSA is attached as Exhibit 2 and incorporated herein by reference.

5.      TBS's job as Servicer was to manage, service and make collections on the Loans, calculate payments of principal and interest on the notes, and report to BNYM and the Noteholders on the financial status of the Borrower-Franchisees.   TBS delegated many of its servicing tasks to Aleritas (then named Brooke Credit Corporation) with respect to the 2006-1 Notes under a Subservicing Agreement dated July 1, 2006 (the "2006-1 Subservicing Agreement"), but remained responsible for their due performance.  A copy of the 2006-1 Subservicing Agreement is attached as Exhibit 3 and incorporated herein by reference.  TBS materially and negligently failed to carry out its responsibilities and thus breached its duties as

Servicer to Plaintiffs.  In doing so, TBS hastened the destruction of the collateral – which included the Loans – and caused tens of millions of dollars in damages to the 2006-1 Issuer and to UCI as noteholder of the notes issued by the 2006-1 Issuer.

6.      This case is brought by BNYM in its capacity as Trustee under a Trust Indenture dated as of July 1, 2006 (the "2006-1 Indenture") between BNYM and the 2006-1 Issuer for the Brooke Credit Loan Securitization Floating Rate Asset-Backed Notes Series 2006-1 (the "2006-1 Notes").  UCI owns all of the 2006-1 Notes.

7.      UCI is the sole Noteholder of the 2006-1 Notes and, under Section 10.6 of the SSA, is a third party beneficiary of the 2006-1 SSA.  BNYM, as Trustee, is a third party beneficiary of the 2006-1 SSA under Section 10.6 of the 2006-1 SSA.  BNYM is also an assign of the 2006-1 Issuer to the 2006-1 SSA pursuant to subsection (f) of the Granting Clause of the Indenture, under which the 2006-1 Issuer assigned to BNYM on behalf of Holders of the Notes "all of the Issuer's right title and interest in and to…(f) the Sale and Servicing Agreement…the Master Agent Security Agreement and the other Related Documents."

8.      Under sections 3.2(d) and 7.4 of the 2006-1 SSA, TBS remained responsible to BNYM and UCI for the performance of the tasks it delegated to Aleritas and liable for breaches of the SSA and the acts of its delegee.

9.      Beginning in at least early 2008, the Brooke Entities and many of the Borrower-Franchisees experienced financial distress.  In order to conceal the Brooke Entities' business problems and the distress of the Borrower-Franchisees from BNYM and UCI, and to increase the cash flow available to the Brooke Entities, Aleritas as Subservicer breached the terms of the Subservicing Agreement in many respects, including falsifying loan performance reports to lenders, concealing Borrower-Franchisee defaults, misappropriating payments on Loans and

improperly modifying the terms of the Loans.  As a result, the value of the Notes and the collateral for them has been decimated.

10.      In the summer of 2008, Aleritas consented to the employment of a Chief Restructuring Officer.  On September 11, 2008, BNYM filed suit in the United States District Court for the District of Kansas seeking, among other things, the appointment of a receiver over certain of the Brooke Entities.  On September 17, 2008, the parties to that suit consented to the appointment of a Special Master with broad authority over Brooke Corp., Brooke Capital and other Brooke entities.  Aleritas was not included within the Special Master's purview because it was already under the management of the Chief Restructuring Officer.

11.      By that time, however, the damage done by the Brooke Entities' management fraud to its business had already occurred.  The Special Master caused Brooke Capital and Brooke Corp. (and another Brooke entity) to file for bankruptcy protection on October 28, 2008 in the United States Bankruptcy Court for the District of Kansas.  Both before and after the appointment of the Special Master and the subsequent bankruptcy, many Borrower-Franchisees have gone out of business as a result of the Brooke Entities' fraud, defalcations and breaches, and the business of others has been highly impaired.

12.      TBS, as Servicer, is as directly responsible for Aleritas' breaches of the Subservicing Agreement as if it had committed them itself.  Further, TBS acted negligently in its own right with respect to its oversight of Aleritas.

13.      TBS expressly agreed to act as an agent for the 2006-1 Issuer, which extended to its responsibility to oversee Aleritas.  TBS violated its duties as Servicer as a result of the malfeasance of its delegee, Aleritas, which acted for the benefit of the Brooke Entities and to the detriment of the 2006-1 Issuer and Plaintiffs by among other things, improperly modifying

Loans, misallocating or permitting other Brooke Entities to misappropriate loan payments and payoff amounts that should have been directed to the 2006-1 Issuer, and concealing the true financial condition of Borrower-Franchisees from the Plaintiffs.

14.     Further, TBS negligently failed to adequately supervise Aleritas, and failed to act with adequate skill and care in the performance and conduct of its servicing business.  These also constitute breaches of the duties TBS owed as Servicer to the 2006-1 Issuer and Plaintiffs, which relied on TBS to perform its duties for the protection of the Noteholder and which contracted with and entrusted TBS with management of crucial aspects of their property interest related to the administration and servicing of the Loans purchased by the 2006-1 Issuer.

**The Parties**

15.     Plaintiff The Bank of New York Mellon is a banking corporation duly organized and existing under the laws of the state of New York, with its principal place of business in New York, New York.  BNYM is acting herein solely in its capacity as indenture trustee under the 2006-1 Indenture.

16.     UCI is a corporation organized and existing under the laws of the Federal Republic of Germany with its principal place of business in Germany.

17.     On information and belief, Defendant TBS is a Delaware corporation with its principal place of business in Warwick, Rhode Island.

**Jurisdiction and Venue**

18.     Plaintiff BNYM is a citizen and resident of New York.  Plaintiff UCI is a citizen and resident of the Federal Republic of Germany.

19.     Defendant TBS is a citizen of Rhode Island and Delaware.

20.     The parties are of diverse citizenship and jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a).

21.     The amount or value of the property in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

22.     Defendant, a corporation, is subject to personal jurisdiction in New York and, accordingly, venue is proper in this Court pursuant to 28 U.S.C. § 1391.  In section 10.3(b) of the 2006-1 SSA, TBS consented to the jurisdiction of this Court and has irrevocably waived any objections, including as to venue, to this forum.

### Facts

23.     The Brooke Entities operated a coordinated insurance agency franchise business. Various entities had responsibilities for, among other things, (i) lending money to Borrower-Franchisees and securitizing or participating such loans, (ii) receiving sales commissions on behalf of Borrower-Franchisees and allocating monies received for payment of loans to securitizations and other lenders, payment of expenses and payment to the franchisees; (iii) providing management services for Borrower-Franchisees and (iv) carrying out servicing responsibilities delegated to them by TBS with respect to loans.

**The Issuance of Notes by the 2006-1 Issuer**

24.     Since at least 2003, Brooke sponsored a number of securitizations (each a "Securitization") pursuant to which it caused to be created special purpose, bankruptcy remote limited liability companies (each a "Securitization Company") to which Aleritas sold various loans in exchange for cash that was raised by the issuance of senior notes by the Securitization Company pursuant to a trust indenture (each an "Indenture") between the Securitization Company and BNYM as the Indenture Trustee for the individual Securitization.

25.     On or about July 1, 2006, for one Securitization (the "2006-1 Securitization"), the 2006-1 Issuer issued $52,346,089.00 in aggregate principal amount of 2006-1 Notes pursuant to the 2006-1 Indenture.

26.     UCI is the owner of all of the 2006-1 Notes.

27.     As of September 3, 2008, $35,858,800.32 in aggregate principal amount of 2006-1 Notes remained outstanding.

**TBS as Servicer**

28.     Pursuant to the 2006-1 SSA, TBS as Servicer was responsible, in general and among other things, for: management of the Loans that constituted the collateral for the 2006-1 Notes; keeping track of payments of interest and principal on the Loans made with respect to Borrower-Franchisees by the Brooke Entities; monitoring the Borrower-Franchisees' financial status, modifying Loans and realizing on collateral; determining the amounts paid to UCI as noteholder for principal and interest on the 2006-1 Notes; and reporting the status of the Loans to BNYM.  As noted, TBS delegated many of its duties under the 2006-1 SSA to Aleritas pursuant to the 2006-1 Subservicing Agreement.

29.     Accurate and diligent servicing of the Loans was critically important to the value of the Notes.  To the extent that payments were not properly made or the financial status of Borrower-Franchisees was not accurately monitored and represented, payment of the Notes and the strength of their collateral would be at risk.  Because, as set forth in detail below, the funds used to make loan payments flowed through the Brooke Entities (including Aleritas), TBS's status as a company purportedly independent of the Brooke Entities was essential to UCI's willingness to purchase the 2006-1 Notes.

30.     As set forth in more detail below, Aleritas did in fact use its position as Subservicer to act improperly for the benefit of the Brooke Entities.  TBS's (i) failure to comply with the terms of the 2006-1 SSA, both directly and as a result of the defalcations by Aleritas, for which TBS is responsible under the 2006-1 SSA, (ii) negligence in providing inaccurate information about the Loans and the Borrower-Franchisees that constituted, as described more

fully below, the collateral for the 2006-1 Notes, and (iii) failure to oversee Aleritas's performance of tasks that TBS delegated to it, allowed Aleritas to act improperly for the benefit of the Brooke Entities and to the detriment of the 2006-1 Issuer.  TBS's breaches and negligence were critical to the Brooke Entities' concealment of the deterioration of the collateral underlying the 2006-1 Notes and the Plaintiffs' inability to take prompt action as that collateral deteriorated.

31.     Pursuant to the 2006-1 Indenture, the 2006-1 Issuer provided security ("Collateral") for its obligation to pay principal, interest and other amounts properly falling due in connection with the Notes it issued.  The Collateral took the form of a first priority perfected security interest in and lien upon virtually all of the 2006-1 Issuer's assets, including among other things all of the Issuer's right, title and interest in and to: (a) the Loans owned by the 2006-1 Issuer ("Asset Pool"); (b) the security for the loans in the Asset Pool; (c) the proceeds of any of the foregoing; (d) the loan files; (e) all of the special trust accounts established to control the flow of funds due to or from the Borrower-Franchisees from the customers and insurance companies to the Indenture Trustee (the "Trust Accounts") and all other bank and similar accounts and lock-boxes relating to the collection of the Loans; and (f) the 2006-1 SSA.

32.     Pursuant to the Indenture, the 2006-1 Issuer granted the Collateral for the 2006-1 Securitization to BNYM, in its capacity as Trustee for the 2006-1 Notes, to hold as trustee for the benefit of the holders of the 2006-1 Notes.

33.     BNYM in its capacity as Trustee under the 2006-1 Indenture is the exclusive party entitled to: (i) funds generated by the Collateral under the Indenture; (ii) liquidate following an event of default any or all part of the Collateral under the Indenture, the proceeds of which are held in trust for the holder of the 2006-1 Notes; and (iii) take measures, upon

consultation with and/or at the instruction of the holder of the 2006-1 Notes to protect the Collateral under the Indenture.

34.     The proceeds of any liquidation of Collateral under the Indenture, the net positive cash flow generated by the Collateral under the Indenture and cash due and payable in respect of the related Notes are remitted to and administered by BNYM for deposit or withdrawal, as the case may be, from a certain account opened with BNYM (the "Series 2006-1 Collection Account") with respect to the 2006-1 Indenture.

**The Asset Pool**

35.     The Asset Pool in respect of the 2006-1 Indenture includes, without limitation, the following types of loans: (i) Loans made by Aleritas to a duly licensed insurance agent or agency, that has entered into an agency agreement with Allstate Insurance Company, an Illinois corporation, or any of its affiliates ("Allstate Loans") and (ii) Loans made by Aleritas to a duly licensed insurance agent or agency (i.e., a Borrower-Franchisee), that has entered into a franchise agreement with an affiliate of Aleritas, Brooke Agency Services Company LLC ("BASC") (as assignee of Brooke Capital).

36.     The 2006-1 Issuer acquired title to the Asset Pool underlying the 2006-1 Notes from Aleritas pursuant to the 2006-1 SSA among the 2006-1 Issuer, Aleritas and TBS.  BNYM is a third party beneficiary and assignee of the 2006-1 Issuer to the SSA.  2006-1 SSA § 10.6; Indenture at 1 (Granting Clause).  Further, UCI is itself a third party beneficiary of the 2006-1 SSA and is fully entitled to enforce the SSA.  2006-1 SSA § 10.6.

**Flow of Funds for the Securitizations**

37.     The maintenance of an asset pool requires regular, proactive monitoring of the contents of the asset pool.  This is customarily performed by an institution with professional expertise in servicing a portfolio of loans.

38.     In this case, TBS was appointed as Servicer pursuant to the 2006-1 SSA.  TBS's

duties included:

> [C]ollection and posting of all payments, responding to inquiries of
> Borrowers on the Loans, investigating delinquencies, sending
> statements or payment coupons to Borrowers, reporting any
> required tax information to Borrowers, monitoring the Loan
> Collateral, accounting for collections and furnishing monthly and
> annual statements to the Issuer and the Trustee with respect to
> distributions and performing the other duties specified in the
> Related Documents.

2006-1 SSA § 3.1.

39.     TBS delegated certain of its duties to Aleritas through the Subservicing

Agreement, but retained full responsibility and liability for the performance of those duties with

respect to the Loans in the 2006-1 Securitization pursuant to the SSA.  2006-1 SSA §§ 3.2(d),

7.4.

40.     The functions delegated by TBS to Aleritas are listed in Exhibit A to the 2006-1

Subservicing Agreement.  These functions included granting payment extensions to borrowers of

Brooke Loans, modifying the terms of Brooke Loans and commencing enforcement proceedings

in respect of non-performing Brooke Loans, all in accordance with agreed upon policies and

procedures.

41.     BASC (in its capacity as "Master Agent" with respect to the Borrower-

Franchisees) was a party to various franchise agreements with individual insurance agents and

insurance agencies ("Insurance Agencies") under which BASC performed various services for

such Insurance Agencies.  These services included maintaining franchise accounts for such

Insurance Agencies and performing certain accounting functions with respect to, among other

things, sales commissions paid to such Insurance Agencies with respect to policies sold or

serviced by them ("Sales Commissions"), all in accordance with agreed upon policies and

procedures.  The Borrower-Franchisees with Loans in the 2006-1 Securitization are Insurance

Agencies.  BASC delegated certain of its obligations as Master Agent to Brooke Capital (as

successor by merger with Brooke Franchise Corporation) under a Master Agent Servicing

Agreement dated July 1, 2006 (the "2006-1 Master Agent Servicing Agreement").

      42.     In addition, BASC was party to Collateral Preservation Agreements with Aleritas

whereby BASC was to provide services in protecting Loan Collateral in the event of a Borrower-

Franchisee's default.  BASC was entitled to additional fees to be paid by Aleritas in the event it

provided such services.  BASC delegated its duties under Collateral Preservation Services

Agreements with respect to the Loans to Brooke Capital pursuant to the 2006-1 Master Agent

Servicing Agreement.

      43.     Borrower-Franchisees pledged Sales Commissions as collateral for their Loans.

In addition, some of the Borrower-Franchisees were also obligors on loans contained in asset

pools that were sold to issuers as collateral for securities issued by Securitization Companies

other than the 2006-1 Issuer ("Other Issues").  On information and belief, in connection with

Other Issues, as well as in respect of the Notes, the Borrower-Franchisees' franchise agreements

with BASC provided that monies received by Borrower-Franchisees were to be delivered to an

individual Receipts Trust Account for each Borrower-Franchisee, held at a local bank.  BASC,

through Brooke Capital as Master Agent Servicer, was then required to sweep those amounts

directly into the Consolidated Receipts Trust Account ("CRTA"), without deposit into any

intervening account, which was defined as a specific account at The First National Bank & Trust,

Phillipsburg, Kansas owned by BASC, in which BNYM had a security interest, and then

transferred within one business day to a master trust account at BNYM, owned by BASC under

the control of BNYM as Master Agent Trustee, and in which BNYM as Master Agent Trustee

had a security interest ("Master Receipts Trust Account").  Master Agent Security Agreement dated as of July 1, 2006, between BASC and BNYM (the "2006-1 Master Agent Security Agreement") §§ 3.1, 3.2.  Commissions paid by insurance companies (other than Allstate Insurance) in respect of Insurance Agencies were to be deposited directly to the CRTA and transferred to the Master Receipts Trust Account within one business day.  *Id.*

44.     If payments from insurance companies or Insurance Agencies were received directly by BASC, as opposed to directly paid to the CRTA or the Master Receipts Trust Account by Borrower-Franchisees, then BASC was obligated to deposit the same into the Master Receipts Trust Account "without transfer into any intervening account."  2006-1 Master Agent Security Agreement § 3.2.

45.     In connection with the Other Issues, as well as in connection with the Notes, BASC also entered into Master Agent Servicing Agreements under which, depending on the agreement, Brooke Capital agreed to provide certain accounting and processing services with respect to the Borrower-Franchisees on behalf of BASC.

46.     Thus, the Borrower-Franchisees did not control the application of Sales Commissions to the payment of their Loans.  Instead, BASC, acting through Brooke Capital, was required to (a) set aside in the Master Receipts Trust Account each Borrower-Franchisees' Sales Commissions in an amount equal to the franchise fees and certain other expenses under the Master Agent Security Agreement, then (b) set aside in the Master Receipts Trust Account the amounts due as Loan payments for each Borrower-Franchisee, then (c) set aside any other amounts due to lenders (that is, for other, presumably subordinated loans that each Borrower-Franchisee might have) and then (d) distribute any remaining Sales Commissions to each Borrower-Franchisee.

47.     With respect to routine monthly loan payments for the 2006-1 Securitizations, TBS (as delegated to Aleritas) was responsible for monitoring remittances and assisting with the transfer of funds to the 2006-1 Collection Account.

48.     BNYM as Master Agent Trustee was required to transfer funds from the Master Receipts Trust Account to the Series 2006-1 Collection Account (or similar accounts set up in respect of the applicable Other Issues), for disbursement in accordance with the priority of payments (known as a "waterfall") in respect of such Notes.  2006-1 SSA § 4.6.

49.     Section 4.6 of the 2006-1 SSA specifies the priority in which funds in the Series 2006-1 Collection Account are to be disbursed on each payment date.  These funds were allocated according to calculations performed by and documented in a certificate signed and delivered by TBS to BNYM ahead of each payment date ("Servicer's Certificate").  The Servicer's Certificate included amounts payable on the 2006-1 Notes to UCI in respect of principal and interest, as well as amounts payable to various Brooke entities in respect of fees and expenses for their services in connection with the Notes.

**TBS's Duties Under the 2006-1 SSA**

50.     Article 3 of the 2006-1 SSA sets out TBS's duties as Servicer.  Section 3.1 of the SSA establishes a principal-agent relationship between the Issuer and the Servicer in connection with the management and monitoring of the Loan Collateral.  Section 3.1 of the 2006-1 SSA provides in part:

> The Servicer is hereby authorized to act as agent for the Issuer and in such capacity shall manage, service, administer and make collections on the Loans, and perform the other actions required by the Servicer under this Agreement.  The Servicer agrees that its servicing of the Loans shall be carried out in accordance with the Servicing Standard.  The Servicer's duties shall include collection and posting of all payments, responding to inquiries of Borrowers on the Loans, investigating delinquencies, sending statements or payment coupons to Borrowers, reporting any required tax

information to Borrowers, monitoring the Loan Collateral, accounting for collections and furnishing monthly and annual statements to the Issuer and the Trustee with respect to distributions and performing the other duties specified in the Related Documents.

51.     Section 7.4 of the 2006-1 SSA provides in part:

> Delegation of Duties.  In the exercise or administration of its duties hereunder, the Servicer (a) may act directly or through subservicers, agents or attorneys pursuant to agreements entered into with any of them, including Brooke Franchise Corporation, the Subservicer and the Master Agent Servicer . . . but the Servicer shall (except as set forth in Section 4.4(g)) remain directly obligated and primarily liable for its obligations under this Agreement in accordance with the provisions of this Agreement without diminution of such obligation or liability by virtue of such delegation or subcontracting of its duties and obligations to the same extent and under the same terms and conditions as if the Servicer were performing such duties and obligations alone.

52.     Section 3.2 of the 2006-1 SSA, among other things, sets forth the requirements for the Servicer's collection of payments on Loans, modifications of Loans, and treatment of potentially defaulted loans.

53.     Section 3.3 of the 2006-1 SSA provides for TBS to use "commercial reasonable efforts to foreclose on or repossess . . . and realize upon the Loan Collateral securing a Loan with respect to which the Servicer has determined that payments thereunder are not likely to be resumed, as soon as is practicable after default on such Loan but in no event later than the date on which all or any portion of a Scheduled Payment has become 30 days delinquent…"

54.     Section 3.9 of the 2006-1 SSA sets out the requirements of the monthly Servicer's Certificate.  The Servicer's Certificate is to be executed by an employee of the Servicer responsible for servicing the Loans, and is to contain, among other things (a) all information necessary to make distributions under the SSA and for the Trustee to send statements to the Noteholders; (b) a listing of each Loan that became a Liquidated Loan or that was paid in full

during the Monthly Period and (c) the weighted average debt-to-revenue ratio for all of the

Loans (other than Liquidated Loans), identified in the 2006-1 SSA as the DTR Actual Ratio (the

"DTR").  The page of the Servicer's Certificate showing the DTR also identified the Internal

Rating (Pass/Watch/Fail) for each Loan in the Securitization.  The Servicer's Certificate was

intended to provide information necessary for the Trustee and UCI to determine the accuracy of

payment and to monitor the performance of the loan portfolio.

      55.    Schedule C-1 to the SSA details the Servicer's responsibilities with respect to

monitoring the Loan Collateral – specifically, undertaking monthly and annual reviews of all

Borrower-Franchisees with principal balances exceeding $50,000.  Any Borrower-Franchisee

who fails the financial tests described is to be placed in a "Watch" or "Fail" rating classification,

which is to be reported in the Servicer's Certificate.

      56.    Exhibit A of the Subservicing Agreement identifies specific tasks of the Servicer

that TBS delegated to Aleritas.  Those tasks include, without limitation:

      (i)    Completing monthly review of Borrower-Franchisees with an
Outstanding Principal Balance exceeding $50,000, in accordance with the
Servicing Standard;

      (ii)    Completing annual review of Borrower-Franchisees with an
Outstanding Principal Balance exceeding $50,000, in accordance with the
Servicing Standard;

      (iii)    Assigning an internal rating classification on all Borrower-
Franchisees with an Outstanding Principal Balance exceeding $50,000, in
accordance with the Servicing Standard;

(iv)     Requesting loss mitigation assistance from BASC for Borrower-Franchisees with a Watch or Failed Rating;

(v)     Delivering default notices to Borrower-Franchisees who have violated a term or condition of their Loan Documents;

(vi)     In the event of any uncured default, requesting assistance from BASC in the repossession of Borrower-Franchisee agency businesses and the sale of collateral securing such defaulted Loan;

(vii)     Monitoring the collateral securing the Loans;

(viii)     Monitoring the performance of the Loans and assisting with the transfer of funds to the Collection Account for the 2006-1 Securitization;

(ix)     Investigating Loan delinquencies; and

(x)     Commencing enforcement proceedings against Borrower-Franchisees and/or collateral securing the Loans.

57.     It was foreseeable, indeed likely, that breaches of the Servicer's contractual obligations would adversely impact the management of the Loans (for example, the failure to investigate a Loan delinquency or the failure to timely deliver a default notice in connection with Borrower-Franchisees that violated a term or condition of their Loan Document).  TBS's duties as Servicer also included at least a minimum level of monitoring and supervision of the loan portfolio and of its subservicer, Aleritas, in accordance with the Servicing Standard.

**TBS's Breaches of the 2006-1 SSA**

**Failure to Conduct Periodic Borrower-Franchisee Financial
Review or to Accurately Disclose "Watch" or "Fail" Loans in Servicer's Certificates**

58.     On information and belief, TBS failed to conduct, or, in the alternative, to accurately report the results to Plaintiffs of, the monthly review of Borrower-Franchisees with an outstanding principal balance exceeding $50,000.

59.     On information and belief, TBS failed to conduct, or, in the alternative, to accurately report the results to Plaintiffs of, the annual review of Borrower-Franchisees with an outstanding principal balance exceeding $50,000.  Had TBS done so, the annual review for many Borrower-Franchisees – which requires a more detailed analysis of revenues to the entire indebtedness of the Borrower-Franchisee rather than just the Loan to such Borrower-Franchisee – would have revealed that such Borrower-Franchisees had substantial indebtedness other than the Loan and would have required many more Borrower-Franchisees to be rated as "Watch" or "Fail."

60.     In connection with the June 2008 Servicer's Certificate for the 2006-1 Securitization, TBS through Aleritas for the first time identified a number of loans in "Level III" collateral protection (the highest level of loss mitigation assistance for the worst performing Borrower-Franchisees).  Those Borrower-Franchisees included: Costless Reliable Insurance Agency, Inc. and Donna Jean Peck, individually; John J. Khoury, C.P.C.U., Inc.; Lenhoff Insurance Services, LLC; Lynch Financial, Inc.; Monte J. Rodriguez, Southampton Financial, Inc.; Unique Dependable Insurance Services, Inc., Cheney & Associates Insurance Services, Inc., Alan Cheney & Associates Insurance Services – Modesto, Inc. and Alan A. Cheney; and Vincent A. LaGrange.

61.     Thus, Aleritas concealed that these loans were nonperforming and that the Borrower-Franchisees were in severe distress by misrepresenting them as performing loans of Borrower-Franchisees in acceptable financial status in connection with Servicer's Certificates from at least January 2008, if not earlier.  Aleritas (in concert with other Brooke Entities) thus concealed deterioration of the portfolio of the 2006-1 Securitization from BNYM and the Noteholders.

**Improper Alteration of Loan Terms and Discharge of Loans**

62.     On information and belief, TBS, acting through Aleritas, improperly changed the terms of Loans in the 2006-1 Securitization and accepted less than the outstanding principal due in discharge of Loans.  TBS, acting through Aleritas, failed to identify these Loans as required by Section 3.9 of the 2006-1 SSA.  TBS's failure allowed the Brooke Entities to misappropriate the monies paid in the modification and improper discharge of the loans to themselves.

63.     On or about August 5, 2008, TBS as Servicer reported that Aleritas had improperly appropriated note payment or payoff funds intended to be deposited with BNYM with respect to the 2006-1 Securitization in the amount of $8,534.

64.     By email dated August 26, 2008, the then-sole director and chief finance officer of Aleritas (as well as Chairman of the Board of Brooke Corp. and Chairman of the Board and CEO of Brooke Capital), Robert Orr, directed Brooke employees, including employees of Aleritas "not to discuss closings with anyone outside of our organization without first discussing with me."  Orr was responding to an email directing that funds from "closings" – payoffs of loans in securitizations – be directed to an account other than that required by the documents governing the relevant securitizations.

65.     By email dated August 27, an Aleritas employee asked Mike Hess (Vice Chairman of Brooke Corporation with responsibilities at Aleritas, and a "longtime friend and

business associate" of Orr), Anita Larson, Mick Lowry (Vice President of Aleritas and Orr's nephew) and other employees of Brooke why proceeds from the payoff of a loan (Southwest Agency) had been made by Aleritas to "BCP" where BCP had no involvement in the loan payoff process.  Lowry's response was that the misapplication of these proceeds was "a confidential and internal matter."

66.     During the course of a meeting on September 3, 2008 in Overland Park, Kansas with, among others, representatives of Fifth Third and UCI, Robert Orr admitted to the Brooke Entities' misappropriation of funds that should have been directed to the securitizations.

67.     By memorandum dated September 8, 2008, defendant Orr disclosed that he had directed Brooke Capital, beginning at an unstated date but not later than August 2008, "to discontinue sending 100% of BASC funds to Bank of New York and instead send the amounts Brooke Capital calculates that are due to investors."  Orr and other personnel at the Brooke Entities concealed and did not disclose to BNYM that they were misappropriating funds belonging to BASC.  On information and belief, Aleritas participated in this misdirection, which resulted in inaccurate information appearing in the Servicer Certificates.

**The SEC's Allegations of Improprieties in Loan Servicing**

68.     The SEC Complaint alleges wide-ranging fraud at the Brooke Entities.  It makes specific allegations concerning defalcations in loan servicing.

69.     Paragraph 102 of the SEC Complaint alleges that Aleritas continued to act as servicer of loans that it originated after those loans were sold to securitizations.  SEC Compl. ¶ 102.  The SEC Complaint continues: "In this capacity, Aleritas was obligated to receive and track periodic loan payments and loan payoffs from borrowers (most of whom were Brooke

Capita franchisees).  Aleritas was then obligated to remit borrower payments promptly to the owners of the loans."  *Id.*

70.     Aleritas breached that obligation.  According to the SEC Complaint:  "However, beginning in at least January 2008 and throughout the first quarter, [Michael] Lowry [CEO of Aleritas until March 2008] directed the fraudulent diversion of borrower payments and payoffs owed to lenders, in order to fund Aleritas' operating expenses."  SEC Compl. ¶ 103.

71.     After Robert Orr, the founder of Brooke Corp. and Brooke Capital, became Chief Financial Officer of Aleritas in March 2008, the fraud continued until the appointment of the Special Master.  SEC Compl. ¶ 104.

72.     By September 2008, Aleritas had diverted more than $5.6 million from securitizations and participating lenders.  SEC Compl. ¶ 108.

**Failure to Realize on Collateral**

73.     On information and belief, TBS has failed to realize on the Collateral for the Loans of defaulted or failed Borrower-Franchisees or ensure that such Collateral was disposed of for the benefit of the 2006-1 Securitization.  The Collateral of failed or defaulted agencies includes customer lists, which can have significant value.

74.     Borrower-Franchisees who failed to meet specific financial performance criteria detailed in Schedule C-1 of the 2006-1 SSA were to receive assistance from BASC under Collateral Preservation Agreements with respect to marketing, operations and management.  If those efforts failed, TBS was empowered under the SSA to realize on the Collateral.  On information and belief, prior to about mid-September, 2008, TBS failed to realize on the collateral of failed agencies, and instead either abandoned such Collateral or permitted Brooke Entities to appropriate the collateral for themselves.

**Termination of Subservicing Agreement**

75.     TBS notified Aleritas of defaults with respect to its subservicing of the Asset Pool in letters dated July 21, 2008 and August 5, 2008.  In an Access Agreement dated as of August 8, 2008, between Aleritas and TBS, Aleritas waived its right to 30 days' prior notice from TBS of the termination of a Subservicing Agreement. Accordingly, in a letter dated as of August 29, 2008 (the "TBS Letter"), TBS terminated the Subservicing Agreement and all of the subservicing agreements to which Aleritas is a party relating to the Other Issues.

76.     On or about September 8, 2008, Aleritas appointed a Chief Restructuring Officer.

77.     On September 11, 2008, BNYM commenced an action entitled *The Bank of New York Mellon v. Aleritas Capital Corporation et al.*, No. 08CV02424 JWL DJW, in the United States District Court for the District of Kansas seeking damages and the appointment of a receiver over certain of the Brooke Entities.

78.     On September 17, 2008, BNYM and the defendant parties in the District of Kansas consented to the appointment of a Special Master over certain of the Brooke Entities, excluding Aleritas.

79.     On October 13 and 14, 2008, the Special Master, on behalf of Brooke Capital, BASC and Brooke Investments, Inc., agreed to release the Borrower-Franchisees in the 2006-1 Securitization from their franchise agreements.  By order dated October 31, 2008 (as amended November 5, 2008), the Bankruptcy Court continued the release of the franchise agreements and continued the powers of attorney.

80.     On October 28, 2008, the Special Master caused certain Brooke businesses, other than Aleritas, to file for protection under Chapter 11 of the Bankruptcy Code.  On June 29, 2009, the Bankruptcy Court converted the cases to Chapter 7.

81.     Sales Commissions received by BNYM in respect of Borrower-Franchisees declined precipitously after August 2008.

82.     Numerous Borrower-Franchisees in the 2006-1 Securitization have gone out of business, are in default of their Loans or are suffering severe business distress.  Payments of principal and interest by the Special Master on the 2006-1 Notes have been missed or have declined substantially.

83.     TBS remains the Servicer of the 2006-1 Securitization.

## COUNT I

### Breach of the SSA by TBS

84.     Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 83 above.

85.     As set forth in paragraphs 58-74, TBS breached the 2006-1 SSA.

86.     TBS's breaches were material and its willful misfeasance, bad faith or negligence in the performance of its duties caused substantial direct loss to Plaintiffs through the misapplication of funds, loss of payments of principal and interest on the Loans, and loss of collateral for the Loans.

87.     TBS's breaches further caused substantial consequential loss to Plaintiffs through the failure to report the decline in the quality of the loan portfolio timely or accurately.  Had the monthly Servicer Reports accurately reflected Watch or Fail Loans or Liquidated Loans, Plaintiffs would have known about the decline in the Brooke Entities' business long before those businesses became nonviable, and could have undertaken actions as provided under the Indenture (such as the appointment of a receiver or the imposition of new management) that would have averted or substantially reduced the loss they have suffered.  Instead, the 2006-1 Securitization has been effectively destroyed.

88.     Under Sections 7.1(c) and 7.1(d) of the 2006-1 SSA, TBS is further required to indemnify, defend and hold harmless UCI and BNYM "from and against any and all costs, expenses, losses, claims, damages and liabilities" (including the reasonable fees and expenses of counsel and expenses of litigation) arising out of, among other things, TBS's material breaches of the 2006-1 SSA.

89.     TBS's breaches of the 2006-1 SSA caused direct and consequential damages to Plaintiffs in an amount to be determined at trial, but, on information and belief, not less than $25 million.

## COUNT II

### Negligence

90.     Plaintiff realleges and re-incorporates the allegations set forth in paragraphs 1 through 89 above as though fully set forth herein.

91.     TBS, as Servicer and agent to the 2006-1 Issuer under the 2006-1 SSA, owed a duty of care to the 2006-1 Issuer in the performance of its duties as a reasonable servicer and in connection with its agency relationship with the 2006-1 Issuer.

92.     TBS was obligated at all times to act as a reasonable servicer and exercise skill and care in carrying out its obligations as Servicer.  The 2006-1 Issuer entrusted key aspects of its property interest in the Loans it purchased to the Servicer (e.g., effective monitoring and management of the Loan Collateral, commercially reasonable management of the Loans, supervision of Aleritas) and the 2006-1 Issuer relied on TBS to carry out its obligations in a reasonable and competent manner.

93.     On information and belief, TBS failed to exercise reasonable care and skill in the execution of its servicing duties.  Under the 2006-1 SSA, TBS is also liable for the negligence of Aleritas.

94.     On information and belief, TBS failed to exercise reasonable care and skill in supervising Aleritas's performance of the duties that TBS delegated to it.  For example, on information and belief, TBS failed to review or audit the financial reviews of Borrower-Franchisees performed by Aleritas to determine that the Pass/Watch/Fail determinations and Liquidated Loan information were accurately presented in the monthly Servicer Certificates signed by TBS.

95.     On information and belief, TBS was negligent in failing to realize on collateral of failed or defaulted Borrower-Franchisees or in oversight of the Brooke Entities undertaking the realization or disposition of such collateral.

96.     On information and belief, TBS was negligent in permitting Aleritas and other Brooke Entities to misrepresent and misappropriate payments of Liquidated Loans and modify loan terms improperly.

97.     As a result of TBS's negligence, the value of the collateral for the 2006-1 Securitization has been catastrophically reduced and the value of the 2006-1 Notes correspondingly destroyed.

98.     The severe drop in value of the collateral and Notes in the 2006-1 Securitization is a direct and proximate result of TBS' failure to exercise reasonable care in connection with the performance of its duties as Servicer, and as agent for the 2006-1 Issuer.

99.     Under Sections 7.1(c) and 7.1(d) of the 2006-1 SSA, TBS is further required to indemnify, defend and hold harmless UCI and BNYM "from and against any and all costs, expenses, losses, claims, damages and liabilities" (including the reasonable fees and expenses of counsel and expenses of litigation) arising out of, among other things, the negligence, willful

misfeasance, or bad faith of the Servicer in the performance of its duties under the 2006-1 SSA or by reason of its reckless disregard of its obligations and duties under the 2006-1 SSA.

100.    TBS's negligence has damaged Plaintiffs in an amount to be determined at trial, but, on information and belief, not less than $25 million.

WHEREFORE, Plaintiffs pray for an order and judgment as follows:

A.    On Count I of the Complaint, for judgment in favor of Plaintiffs and against Defendant, in an amount to be determined at trial, on information and belief amounting to at least $25 million, that is equal to the direct and consequential damage caused by Defendant's breach of contract.

B.    On Count II of the Complaint, for judgment in favor of Plaintiffs and against Defendant, in an amount to be determined at trial, on information and belief to at least $25 million, for damages proximately caused by Defendant's negligence.

C.    For pre-judgment interest and Plaintiffs' costs and disbursements herein

D.    For such other and further relief as the Court deems equitable and just.

New York, New York
July 14, 2011

SEWARD & KISSEL LLP

_____s/ Mark J. Hyland_____
Mark J. Hyland
Jeffrey M. Dine
Brian P. Maloney
One Battery Park Plaza
New York, New York 10004
(212) 574-1200

*Attorneys for Plaintiffs The Bank of New York Mellon, as Indenture Trustee, and UniCredit Bank AG*

SK 26323 0008 1212306

-25-