UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK MELLON,
as Trustee, and UNICREDIT BANK AG,

                    Plaintiffs,

against

TEXTRON BUSINESS SERVICES, INC.,

                    Defendant.

Civil Action No. 11 Civ. 4865 (JSR)

## ANSWER

For its answer to the Complaint herein, Defendant Textron Business Services, Inc. ("TBS"), pleads as follows:

1.      With respect to the first sentence of Paragraph 1 of the Complaint, defendant TBS denies the allegations therein, except that defendant admits that this case arises out of a particular "securitization" known herein as the "2006-1 Securitization" that was structured by the Brooke Entities, as described in more detail below, and that the SEC has alleged that certain senior management at the Brooke Entities committed securities fraud in the manner set out in the SEC Complaint which is attached to the plaintiffs' Complaint. As will be described below, in the 2006-1 Securitization plaintiff The Bank of New York Mellon ("BNYM") was the Master Agent Trustee and Indenture Trustee, TBS was the Servicer, and 100% of the Note from the Issuer in the 2006-1 Securitization was purchased by Black Forest Funding Corporation ("BFFC"), an affiliate of HVB-Bayerische Hypo-und Vereinsbank AG, a predecessor of plaintiff UniCredit. Defendant admits the allegations made in the second sentence of said paragraph of the Complaint.

2.      Defendant admits that Paragraph 2 of the Complaint is an incomplete, generalized summary of some aspects of the business of the Brooke Entities, but (i) states that in the case of the 2006-1 Securitization the Issuer issued a single Note, to BFFC (the "2006-1 Note"), (ii) refers to the 2006-1 Securitization transaction documents for the specifics of the transaction, including the specifics of how and for what purpose the Loan payments were to be collected and applied, and (iii) states that the Brooke Entities engaged in other lines of business, including, as relevant here, the franchising of insurance agencies, providing bookkeeping, cash management and other back office support to franchisees, and extending credit to other insurance agencies and to funeral homes that were not franchisees.  Except as thus stated, defendant denies the allegations made in said paragraph.

3.      Defendant denies the first and second sentences of Paragraph 3 of the Complaint as phrased, because such statements are unlimited in scope as to time, but admits that the partial quotations are accurately attributed to the SEC.  Only a few portions of the SEC's allegations with respect to the fraudulent activities of the Brooke Entities directly involved the management of the various securitizations (e.g., the allegations of "diversion of borrower payments" in SEC Complaint ¶¶ 102-08), and these allegations exclusively concern events occurring in 2008 when some Brooke Entities faced "liquidity crises"; the SEC Complaint does not mention any diversions or other misconduct connected to the 2006-1 Securitization.  Accordingly defendant denies having knowledge or information sufficient to form a belief as to how the SEC allegations of "massive financial fraud" relate to the creation or operation of the 2006-1 Securitization, except as elsewhere pleaded herein.  Defendant admits that Exhibit 1 to the Complaint is an accurate copy of the SEC Complaint, but denies that it is appropriate for plaintiffs to "incorporate . . . by reference" the SEC allegations into this Complaint.

4.      Defendant admits the allegations of Paragraph 4 of the Complaint, but respectfully refers to the 2006-1 SSA for its terms.

5.      With respect to the first sentence of Paragraph 5 of the Complaint, defendant admits that it had the contractual obligations set forth in the 2006-1 SSA and denies the allegations in such first sentence to the extent these characterizations go beyond the specifics of the 2006-1 SSA (for example, the Servicer had no obligation to "report to BNYM and the Noteholders on the financial status of the Borrower-Franchisees" except insofar as stated in 2006-1 SSA §§ 3.9 and 4.8).  With respect to the second sentence of said Paragraph, (i) defendant states that plaintiffs were aware prior to entering into the 2006-1 Securitization transaction that as part of the transaction structure the Servicer would have a Subservicing Agreement with the initial maker of the Loans (Brooke Credit Corp., later known as Aleritas) and that the 2006-1 Securitization followed the same arrangement in this regard as did prior Brooke securitizations with which both plaintiffs were familiar, and (ii) defendant refers to the Subservicing Agreement for its terms and to the SSA for the terms of TBS's contractual obligations (including 2006-1 SSA §§ 3.2(d) and 7.4 with respect to its obligations notwithstanding any subservicing arrangement).  Defendant otherwise denies the allegations of such second sentence to the extent they purport to go beyond the contractual provisions. Defendant admits that Exhibit 3 is an accurate copy of the Subservicing Agreement.  Defendant denies the allegations in the fourth and fifth sentences of Paragraph 5 of the Complaint, and states that plaintiffs' purported losses were not caused by any breach of the 2006-1 SSA and that nowhere in the Complaint do plaintiffs allege any specific information about how any alleged conduct by the Servicer caused plaintiffs actual financial harm or "caused destruction of the collateral," either in the aggregate or with respect to any specific Loan that constituted collateral

for the 2006-1 Note (see, e.g., defendant's Answers to Complaint ¶¶ 62, 67, 73, 86, and 87 below).

6.      With respect to the first sentence of Paragraph 6 of the Complaint, defendant admits that BNYM was, among several roles in the 2006-1 Securitization, the Trustee under the 2006-1 Indenture and that BNYM purports to bring this action in that capacity. As above pleaded, BFFC was the purchaser of 100% of the" 2006-1 Notes" (there was only a single Note). Defendant lacks knowledge or information sufficient to form a belief as to the accuracy of the second sentence of said paragraph, asserting that plaintiff UniCredit is the current owner of said 2006-1 Note. Except as thus stated, defendant denies the allegations made in said paragraph.

7.      With respect to the first two sentences of Paragraph 7 of the Complaint, defendant states that it lacks knowledge or information sufficient to form a belief as to the accuracy of the statement that plaintiff UniCredit is the current owner of said 2006-1 Note, but admits that the Noteholder and the Indenture Trustee were third party beneficiaries under the 2006-1 SSA to the extent, and only to the extent, set forth therein. Defendant admits the third sentence of said Paragraph to the extent that BNYM was a collateral "assign," but states that in such capacity BNYM had no greater rights than, and was subject to the same defenses as, the Issuer. Defendant otherwise denies the allegations of said Paragraph. Defendant further states that in December 2008 BNYM delivered a purported "strict foreclosure" notice with respect to the Collateral subject to the Indenture, under the procedure set forth in N.Y.U.C.C. § 9-620. See Answer ¶ 212 below and Exhibit A hereto. Based on the terms of that notice and by operation of law it appears that BNYM is now the owner of the Loans (subject to any defenses thereto). The transfer of such Collateral ownership would, by operation of law and as acknowledged in

BNYM's Section 9-620 notice (which was signed by plaintiff UniCredit as attorney-in-fact for BNYM), occur "in full satisfaction of the Issuer's Secured Obligations . . . including the obligation to pay the outstanding principal and accrued and unpaid interest on the Notes."

8.      With respect to Paragraph 8 of the Complaint, defendant refers to the 2006-1 SSA (including §§ 3.2(d) and 7.4) for its terms and denies the allegations of said Paragraph to the extent these differ from the contractual provisions; defendant specifically denies that it is "liable for . . . acts of its delegee" (by which plaintiffs mean Aleritas).

9.      Defendant admits the allegations of the first sentence of Paragraph 9 of the Complaint as a generalized statement. Defendant denies the remainder of such Paragraph 9, except as set forth specifically below (e.g., in answering Complaint ¶ 63) and states that (i) plaintiffs have no standing to assert claims based on the Subservicing Agreement (as opposed to the 2006-1 SSA) and (ii) plaintiffs' purported losses were not caused by any breach of the 2006-1 SSA.

10.      Defendant admits the allegations of Paragraph 10 of the Complaint except to state that the authority of the Special Master was specified in the court order appointing him and to deny having knowledge or information sufficient to form a belief as to (i) whether Aleritas "consented" to the Chief Restructuring Officer (although it did "appoint" one, see Complaint ¶ 76) and (ii) why BNYM or others did not seek to include Aleritas "within the Special Master's purview."

11.      Defendant admits the allegations contained in the second sentence of Paragraph 11 of the Complaint but denies, as phrased, the over-generalized statement in the first sentence thereof with respect to the state of the business of the Brooke Entities. With respect to the remainder of such Paragraph, defendant admits that some 2006-1 Borrower-Franchisees had

gone out of business "both before and after the appointment of a Special Master and the subsequent bankruptcy" (with most such closures occurring after BNYM obtained appointment of a Special Master). Defendant denies that such closings or any deterioration in the financial condition of Borrower-Franchisees in the 2006-1 Securitization was entirely, or even primarily, "the result of the Brooke Entities' fraud", etc., rather than the result of (a) the business circumstances of such Borrower-Franchisees, (b) the fact that the net portion of some such businesses' commission revenues after Franchisor fees and required Loan payments left them with insufficient net revenues to sustain operations, (c) decisions by BNYM and UniCredit in September-October 2008 that prevented funds that belonged to the franchisees from flowing out of the MRTA (as defined in Answer ¶ 23 below) to pay for back office and other support needed by the franchisees (see Answer ¶¶ 203-08 below), and, eventually, (d) the loss of the back office services provided by the Franchisor and of the ability to write insurance (and generate Sales Commissions) through the Brooke Master Agent (see Complaint ¶ 35), as a result of events following the appointment of the Special Master, including the decision by UniCredit not to extend further credit to otherwise profitable franchisees during this difficult period .

12.     Defendant denies the allegations of Paragraph 12 of the Complaint and states that the Servicer's obligations are limited to those set forth in the 2006-1 SSA and its liability is limited as also set forth therein.

13.     Defendant admits that it was authorized to act as agent for the Issuer as set forth in the 2006-1 SSA, and only to that extent. Defendant denies that it had any obligation to the Issuer to "oversee Aleritas." Aleritas was itself the sole equity member of the Issuer (an LLC), and the President of Aleritas was the President of Issuer. Defendant otherwise denies the allegations of Paragraph 13 of the Complaint except as specifically set forth below.

14.     Defendant denies the allegations in Paragraph 14 of the Complaint, including without limitation the allegation that plaintiffs "contracted with" TBS.

15.     Defendant admits the first sentence of Paragraph 15 of the Complaint. As to the second sentence thereof, defendant admits that BNYM purports to bring this action in its capacity as Indenture Trustee, but denies that this somehow limits its legal presence in this lawsuit for purposes of any counterclaims or otherwise.

16.     Defendant admits the allegations of Paragraph 16 of the Complaint.

17.     Defendant admits the allegations of Paragraph 17 of the Complaint except that defendant states that its principal place of business is in Providence, Rhode Island.

18.     Defendant admits the allegations of Paragraph 18 of the Complaint.

19.     Defendant admits the allegations of Paragraph 19 of the Complaint to the extent stated above in response to Paragraph 17.

20.     Defendant admits the allegations of Paragraph 20 of the Complaint.

21.     Defendant admits the allegations of Paragraph 21 of the Complaint.

22.     Defendant admits the allegations of Paragraph 22 of the Complaint, except that it denies the allegations in the second sentence thereof to the extent, if any, that these purport to exceed what is stated in section 10.3(b) of the 2006-1 SSA.

23.     Defendant admits the allegations of Paragraph 23 of the Complaint as a generalized, and incomplete, description of the business of the Brooke Entities, but for clarification states that (i) pursuant to the Master Agent Security Agreement ("MASA," a true copy of which is Exhibit B to this Answer), for which BNYM was also the Trustee, all sales commissions relating to Borrower-Franchisees which had Loans in the 2006-1 Securitization were required to be paid into the Master Receipts Trust Account ("MRTA") at BNYM under the

supervision and control of BNYM (and not "allocated" in advance by any Brooke Entity);
(ii) TBS was not the Servicer for all the securitizations (an affiliate of BNYM was the Servicer
for three of the earlier securitizations, all of which were still in existence at the time the Special
Master was appointed); (iii) not all the Loans in the 2006-1 Securitization were Loans to
Borrower-Franchisees (a substantial portion were Loans to independent Allstate agents who were
not franchisees); and (iv) while TBS engaged Aleritas to perform certain functions as set forth in
the Subservicing Agreement, not all of the specific tasks for which Aleritas was engaged were
services required of TBS under the 2006-1 SSA.

24.    Defendant admits the allegations of Paragraph 24 of the Complaint as a
generalized description of the securitization process but states for clarification that (i) the first
such securitization for the Brooke Entities occurred in April 2003 ( the sequence of the
securitizations is described in Answer ¶¶ 118-20, 126-28 below) and (ii), while securitizations
generally did include an Indenture as part of the numerous transaction documents, in general and
in the case of the 2006-1 Note, the Notes were purchased by the Noteholder pursuant to a
Subscription Agreement, as set forth therein.

25.    Defendant admits the allegations of Paragraph 25 of the Complaint, except
to state that in this instance there was only a single Note.

26.    With respect to Paragraph 26 of the Complaint, defendant states that the
2006-1 Note was issued to BFFC, an affiliate of a predecessor of UniCredit, and defendant
denies having knowledge or information sufficient to form a belief as to whether or how plaintiff
UniCredit acquired the 2006-1 Note for its own account.

27.    Defendant admits the allegations of Paragraph 27 of the Complaint and
states for clarification that the original principal amount of the 2006-1 Note was $52,346,089 and

that in December 2008 the 2006-1 Note apparently was satisfied by operation of law pursuant to plaintiffs' use at that time of the "strict foreclosure" procedure of N.Y.U.C.C. § 9-620.

28.     With respect to Paragraph 28 of the Complaint, defendant admits that its responsibilities under the 2006-1 SSA included "keeping track of payments of interest and principal on the Loans" and "determining the amounts" to be paid to the Noteholder, as well as other specific tasks set forth in the 2006-1 SSA, but because the first sentence of said paragraph is an overgeneralized statement which is inaccurate in some of its generalities, defendant otherwise denies the allegations of said sentence and refers to the 2006-1 SSA for its terms. Defendant admits that it engaged Aleritas to perform certain contractual tasks pursuant to the Subservicing Agreement, refers to the Subservicing Agreement for its terms, states that plaintiffs were at all times aware of such engagement and the terms thereof (and knew prior to entering into the 2006-1 Securitization that this agreement was part of the transaction structure, as it had been in prior Brooke securitizations with which both plaintiffs were familiar), and states that plaintiffs were always aware that certain reports received by plaintiffs were prepared by Aleritas. Defendant otherwise denies the allegations of the second sentence of said paragraph.

29.     Defendant denies the allegations of Paragraph 29 of the Complaint, including without limitation (i) the implication that it was the Servicer's responsibility to "monitor . . . the financial status of Borrower-Franchisees" as opposed to conducting the discrete and limited analyses set forth in Schedule C-1 to the 2006-1 SSA; (ii) the implication that Servicer was required to "represent . . . the financial status of Borrower-Franchisees" other than by providing the information required for its monthly Certificate pursuant to 2006-1 SSA §3.9; and (iii) the claim that "TBS's status . . . was essential to" UniCredit's decision to purchase the 2006-1 Note (which, incidentally, was purchased by BFFC, not plaintiff UniCredit). Defendant

9

further states that both at the time of the closing of the 2006-1 Securitization and thereafter any assessment of the risks of the Note investment was entirely the responsibility of the Note purchaser, and not of TBS, and that BFFC and UniCredit had ample opportunity to investigate these risks for themselves.  See Answer ¶¶ 179-202 below.

30.     Defendant denies the allegations of Paragraph 30 of the Complaint except as set forth in response to the "detail below" to which that paragraph refers (see Answer ¶¶ 60-64).  Defendant further states (i) that the primary "collateral underlying the 2006-1 Notes" was the stream of insurance brokerage commissions (labeled "Sales Commissions" in the MASA) that secured the Loans and hence the Notes and (ii) that pursuant to its duties as Master Agent Trustee BNYM was to receive all such Sales Commissions into the MRTA, as part of a process set forth in Section 3 of the MASA that did not involve the Servicer, and that BNYM was required to post such Sales Commissions to the account of each Borrower-Franchisee as set forth in MASA § 3.3 (again, a process that did not involve the Servicer); thus BNYM is charged with direct knowledge of any "deterioration of the collateral underlying the 2006-1 Notes" insofar as that may have involved the level of Sales Commissions, whether in the aggregate for the 2006-1 Securitization or for particular Borrower-Franchisees.  See Answer ¶¶ 133-56 below.

31.     Defendant admits the allegations of Paragraph 31 of the Complaint.

32.     Defendant admits the allegations of Paragraph 32 of the Complaint, but refers to the Indenture for the specific terms of the "grant" of the Collateral as security for the 2006-1 Note and incorporates by reference Answer ¶ 7.

33.     Defendant denies the allegations of Paragraph 33 of the Complaint as phrased, and refers to the Indenture, the 2006-1 SSA and the MASA for their terms.  Defendant

incorporates by reference Answer ¶ 7, and states that it appears that BNYM foreclosed on the Collateral in December 2008.

34.     Defendant denies the allegations of Paragraph 34 of the Complaint as phrased because the repeated use of the phrase "under the Indenture" is misleading and confusing, because certain of these matters are dealt with in the MASA rather than the Indenture, and because certain of the details alleged therein are incorrect.  Defendant states that (i) with respect to Borrower-Franchisees, pursuant to MASA § 3, BNYM was to receive into the MRTA, as Master Agent Trustee, the gross cash flow comprising their Sales Commissions (not the "net positive cash flow"), (ii) the amount to be transferred to the 2006-1 Collection Account by BNYM was the amount of Sale Commissions that was properly attributable to payments due under each Borrower-Franchisee's Loan (not the "net positive cash flow"), and (iii) that BNYM's duties as Master Agent Trustee included determining what Borrower-specific "cash generated" was properly payable to the 2006-1 Collection Account in satisfaction of the month's Loan payments and then effecting such transfers (MASA § 3.2(b)).  Defendant refers to Answer ¶¶ 129-38 below for a more complete and correct statement of what funds were to be swept into the MRTA and what funds were to be transferred into the 2006-1 Collection Account.

35.     Defendant admits the allegations of Paragraph 35 of the Complaint.

36.     Defendant admits the allegations of the first sentence of Paragraph 36 of the Complaint, stating for clarification that title to the Asset Pool was actually acquired by the 2006-1 Issuer pursuant to a separate document and only after passing through an intervening entity.  As to the remainder of said paragraph, defendant admits that BNYM and the Noteholder were third party beneficiaries of the 2006-1 SSA to the extent, and only to the extent, set forth therein and that BNYM was granted a collateral security interest in the Asset Pool to the extent

set forth in the Indenture, states that certain of these interests would have been extinguished by reason of the satisfaction of the 2006-1 Note by operation of U.C.C. § 9-620, and otherwise denies the allegations of said Paragraph.

37.    Defendant denies the allegations of Paragraph 37 of the Complaint except to state that many securitization structures do employ a "servicer" as part of the structure, with whatever specific duties may then be assigned to the servicer by contract.

38.    Defendant admits the allegations of Paragraph 38 of the Complaint, but states that the content of the duties generally described in the quoted passage was then specified in the other provisions of the 2006-1 SSA.

39.    With respect to Paragraph 39 of the Complaint, defendant denies the allegations thereof except that defendant admits that TBS engaged Aleritas to perform certain functions with respect to Loans for Borrower-Franchisees as set forth in the Subservicing Agreement, with the full knowledge of plaintiffs and without any objection on their part, and that TBS remained obligated for the performance of its contractual obligations as set forth in sections 3.2(d) and 7.4 of the 2006-1 SSA, and subject to the limitations set forth in the 2006-1 SSA.

40.    With respect to Paragraph 40 of the Complaint defendant admits that the tasks for which Aleritas was engaged by TBS are listed on Exhibit A to the Subservicing Agreement and that these included "granting payment extensions" and "modifying the terms" of Loans in accordance with certain standards, which are functions of the Servicer under the 2006-1 SSA; defendant otherwise denies the allegations of such Paragraph, including the implication that "commencing enforcement proceedings" was a responsibility of TBS under the 2006-1 SSA except in the technical sense set forth in Schedule C-1 thereto, which was the Servicing Policy initially established by Aleritas for Borrower-Franchisee Loans. For clarification, under the

2006-1 SSA and specifically Schedule C-1 thereto the "liquidation of collateral" and the "sale of collateral securing [the] loan" was the responsibility of the Master Agent ("Master Agent . . . [has] been contracted to provide loss mitigation activities . . . Servicing Agent's involvement in loss mitigation is primarily limited to identifying a problem in the review process . . ." and "liquidation of collateral is completed by Master Agent"). With plaintiffs' knowledge and approval, the Master Agent (BASC) contracted with the Master Agent Servicer (the Franchisor) to conduct the Loss Mitigation Assistance, including the liquidation of collateral. Pursuant to section 3.2(d) of the 2006-1 SSA, the Servicer (TBS) "shall not be liable for any action or omission of the Master Agent Servicer."

      41.    Defendant admits the allegations of Paragraph 41 of the Complaint, but also states that BASC as Master Agent was also a party to the MASA (Exhibit B hereto) that was part of the 2006-1 Securitization, that BASC had certain responsibilities with respect to the collection and "sweeping" of Sales Commissions (and other matters) as set forth therein, that these BASC responsibilities also were to be handled by Brooke Capital (the Franchisor) pursuant to the 2006-1 Master Agent Servicing Agreement and that BNYM also had responsibilities for certain accounting for, and transfers of, Sales Commissions as set forth in MASA § 3.

      42.    Defendant admits the allegations of Paragraph 42 of the Complaint but states for clarification that (i) these "CPAs" had been entered into by Brooke Credit Corporation (Aleritas) as the initial lender of the Loans, (ii) payment of any such "additional fees" or any fees charged by BASC for such Loss Mitigation Assistance (including liquidation of collateral) was not the obligation of TBS as Servicer or of Aleritas in its capacity as Subservicer and (iii) the extent to which BASC or the Franchisor was entitled to such "additional fees," what entity might

owe such fees, and how any such fees were to be paid from Sales Commissions, if at all, are matters in dispute.

43.     Defendant admits the allegations of Paragraph 43 of the Complaint, except to state that the procedures with respect to funds relating to Borrower-Franchisees with loans in more than one securitization were also subject to specific intercreditor agreements.  Defendant refers herein to the Master Receipts Trust account as the "MRTA" and to the 2006-1 Master Agent Security Agreement as the "MASA," and with respect to the details set out in this paragraph, defendant refers to the MASA for its terms.

44.     Defendant admits the allegations of Paragraph 44 of the Complaint, and defendant states for clarification with respect to this and the preceding paragraph (i) that commissions with respect to Allstate Loans were covered by MASA § 3.6, (ii) that these provisions described in said paragraph applied to the Franchisor as well as to BASC and (iii) that under the MASA all funds deposited in the MRTA were to be under the control of BNYM and were to be transferred from the MRTA to other accounts or otherwise applied in the manner set forth in the MASA, pursuant to the accounting for Sales Commissions specified in MASA § 3.3, which accounting was to be conducted and implemented by BNYM as Master Agent Trustee.

45.     Defendant admits the allegations of Paragraph 45 of the Complaint and refers to Section 2 of the MASA for the specific terms.

46.     Defendant admits the allegations of the first sentence of Paragraph 46 of the Complaint.  Defendant denies the remainder of said Paragraph and states that the activities described in Paragraph 46 were not the responsibility or prerogative of BASC but were the contractual obligations of BNYM as the Master Agent Trustee pursuant to MASA §§ 3.3-3.5 (each section stating that "Master Agent Trustee shall" carry out the specified activity).

47.   Defendant denies the allegations of Paragraph 47 of the Complaint as stated and refers to the 2006-1 SSA for a correct description of its obligations, which included providing the monthly information specified in Sections 3.9 and 3.13 of the 2006-1 SSA.  In that regard, defendant states that, rather than being "remitted," in the ordinary course Loan payments were to be collected through the mechanism of the transfer of Sales Commissions and other amounts into the CRTA and the MRTA, to be followed by the allocation by BNYM of such funds to Loan obligations on a borrower-specific basis (MASA § 3.3(b)), which was then to be followed by BNYM's transferring such amounts into the 2006-1 Collection Account (MASA § 3.5).  Defendant denies that it, rather than BNYM, was "responsible for monitoring remittances" to the MRTA and states that while it did assist in confirming the figure for the aggregate Loan payments due to the 2006-1 Collection Account for a month or some other period, it was BNYM's responsibility to allocate the Sales Commissions to each Borrower-Franchisee and thereupon segregate amounts to be transferred for that Borrower's Loan payment and then to effect the proper "transfer of funds to the 2006-1 Collection Account."

48.   Defendant admits the allegations of Paragraph 48 of the Complaint, stating for clarification that under MASA § 3.5 the transfers to the 2006-1 Collection Account were to occur within two business days of deposits into the MRTA, whereas the disbursements from the 2006-1 Collection Account pursuant to 2006-1 SSA § 4.6 were to occur at the end of each month (see definition of "Payment Date").

49.   Defendant admits the allegations of the first and second sentences of Paragraph 49 of the Complaint.  With respect to the final sentence of said paragraph, defendant admits that the Certificate set forth certain amounts to be paid to BNYM as Indenture Trustee, to the Servicer, to the Franchisor (as Master Agent Servicer), to the Noteholder, and, in certain

circumstances, to the Issuer to the extent permitted by Section 4.6 of the 2006-1 SSA; defendant otherwise denies the allegations in such sentence.

50.    With respect to Paragraph 50 of the Complaint, defendant admits that certain of its duties are generally described in Article 3 of the 2006-1 SSA and that the paragraph's quotation from Section 3.1 thereof is accurate but incomplete.  Defendant denies that Section 3.1 "establishes a principal-agent relationship" with the Issuer, and defendant states that other portions of the 2006-1 SSA, including, for example, 2006-1 SSA §§ 3.2-3.17 and §§ 4.2-4.5 and § 4.8 as well as Schedule C-1 (insofar as Borrower-Franchisee Loans are concerned), set forth the specifics of the contractual obligations of the Servicer.

51.    Defendant admits the allegations of Paragraph 51 of the Complaint.

52.    Defendant admits the allegations of Paragraph 52 of the Complaint except to deny that Section 3.2 makes reference to "potentially defaulted loans." 2006-1 SSA § 3.2 refers to Liquidated Loans (a defined term), which are (pursuant to that definition) Loans that (with one possible exception) are actually in default.  Defendant also states for clarification that in the ordinary course Loan payments were not "collected" by the Servicer but made through the CRTA, MRTA and 2006-1 Collection Account as stated above.

53.    Defendant admits the allegations of Paragraph 53 of the Complaint except to state that with respect to Loans of Borrower-Franchisees (which are distinguished for these purposes from "Allstate Loans"), the procedures for foreclosing upon, repossessing or otherwise "realizing" upon the collateral are expressly entrusted to the Master Agent, not the Servicer (see Answer ¶ 40 above).

54.    Defendant admits the allegations of the first and second sentences of Paragraph 54 of the Complaint.  Defendant denies the remainder of the allegations in said

paragraph except to admit that the Certificate was intended to provide the Trustee with information necessary to make accurate payments from the 2006-1 Collection Account. See MASA § 3.5 and 2006-1 SSA § 3.9.   Defendant further states (i) that the aggregate DTR is shown on the Certificate, but that, although a "Credit Review" worksheet was provided with the Servicer's monthly report, Section 3.9 does not require that the Certificate include a Loan-specific listing of the "Internal Rating" for each Loan (the contractual obligation as to the Certificate itself was limited to stating the total number of Loans with each rating, as stated in 2006-1 SSA § 4.8 (x)), (ii) that for the Servicer the only contractual function of such "internal ratings" of Borrower-Franchisees was with respect to notifying the Master Agent for purposes of arranging Loss Mitigation Assistance as set forth in Schedule C-1, and (iii) that TBS as Servicer had no contractual responsibility or liability to the Trustee or Noteholder with respect to such ratings except to report them in the aggregate in the Certificate.

     55.    Defendant admits the allegations of Paragraph 55 of the Complaint insofar as Loans to Borrower-Franchisees were concerned, except that defendant denies that Schedule C-1 or any provision of the SSA requires that these ratings be reported in the Certificate on a borrower-specific basis.   Defendant further states that the "reviews of Borrower-Franchisees" were to be limited to certain analytic financial calculations as set forth in Schedule C-1.   Finally, defendant states that any assessment of the Loans, in the aggregate or individually, as they might affect the creditworthiness or collectability of the 2006-1 Note was the responsibility of the Noteholder and not of the Servicer.

     56.    Defendant denies the allegations of the first sentence of Paragraph 56 of the Complaint but admits that TBS engaged Aleritas to perform the tasks listed on Exhibit A to

the Subservicer Agreement.  Defendant admits that the tasks listed in the second sentence of said

paragraph are included among the tasks for which TBS engaged Aleritas.

      57.    Defendant denies the allegations of the first sentence of Paragraph 57 of

the Complaint as vague and conclusory and denies the allegations of the second sentence thereof

except to admit that the Servicer had the contractual obligations set forth in the 2006-1 SSA.

Defendant states that the "management of the Loans" was not the responsibility of the Servicer

and that it was not foreseeable, in light of the separate arrangement for collection of gross Sales

Commissions for Borrower-Franchisees through the MASA structure, that any breaches of the

Servicer's obligations of the sort alleged by plaintiffs herein (such as those involving the internal

ratings of Borrower-Franchisee Loans) would "adversely impact" the collection of otherwise

realizable Collateral pledged to BNYM.  Defendant denies that any alleged breaches of the 2006-

1 SSA alleged by plaintiffs herein resulted in losses to plaintiffs.  Defendant also denies that it

could be reasonable for the Servicer to anticipate that (A) BNYM would fail to perform the

central function of its role as Master Agent Trustee, in the manner described below at Answer

¶¶ 141-69, thus both (i) depriving the Noteholder and the Servicer (as well as the Trustee itself)

of valuable information about the Loans and the Borrowers and then (ii) setting the stage for

various diversions of funds by Brooke Entities that might otherwise have been detected or

avoided (see Answer ¶¶ 170-78 below) or (B) that BNYM would take steps, with the Noteholder,

that would force the collapse of Borrower-Franchisees in the manner that occurred in September-

October 2008 (see Answer ¶¶ 203-08 below).

      58.    Defendant denies the allegations of Paragraph 58 of the Complaint, and

denies the implied premise that it had a duty to "report the results [of the monthly review of a

Borrower-Franchisee's Loan] to Plaintiffs".  See Answer ¶ 5. Defendant further states that the

"monthly review" for Borrower-Franchisees that is described in Schedule C-1 to the SSA consists of the computation of a single ratio ("the debt/revenue ratio"), which is to be computed using the outstanding principal debt on the Loan (which was accurately reported in the Certificates) and the "annualized commission revenues," which "Master Agent is responsible to provide to Servicing Agent," and which, on information and belief, the Master Agent Servicer (the Franchisor) supplied to Aleritas and Aleritas then used in assigning the internal rating. Pursuant to SSA § 7.3, the Servicer was entitled to rely in good faith on the information thus submitted. In addition, defendant states that neither (i) the rating of specific borrowers as "watch" or "fail" rather than "pass" nor (ii) the aggregate number of borrowers in such categories gave rise to any contractual rights for the Trustee or Noteholder with respect to the Note or the Indenture or otherwise. The only contractual significance of such ratings was the qualification of such Borrower-Franchisees for Loss Mitigation Assistance, to be provided by the Master Agent Servicer. Defendant states that the Complaint does not allege that any monthly "debt/revenue" calculations or the information on which they were based were wrong in any particular, and defendant is not aware that they were. Defendant further denies that any errors or inaccuracies in the internal ratings caused any damage to plaintiffs.

59.    With respect to Paragraph 59 of the Complaint, defendant admits that it did not itself conduct the "Annual Borrower Review" described in Schedule C-1 for the Borrower-Franchisees until TBS terminated Aleritas as Subservicer on August 29, 2008 but rather relied on Aleritas to carry out this task in accordance with the Subservicing Agreement using information supplied by the Master Agent Servicer, and defendant otherwise denies the allegations in said paragraph. Defendant denies the implied premise that it had any obligation to "report the results [of such reviews] to Plaintiffs," and further states that Plaintiffs were aware

that some Borrower-Franchisees had "substantial indebtedness other than the Loans." Defendant further states that the only contractual effect of the internal ratings was with respect to Loss Mitigation Assistance for the Borrower-Franchisees and that the internal ratings did not give rise to any contractual rights for the Noteholder or the Indenture Trustee with respect to the Loans or the Borrower-Franchisees. In the absence of discovery of Aleritas and other Brooke Entities, defendant lacks knowledge or information sufficient to form a belief as to the extent to which the internal ratings assigned by Aleritas were the result of annual review calculations or monthly review calculations, but defendant notes that plaintiffs have not identified any specific rating as inaccurate. See Answer ¶ 58. On information and belief, the procedures followed by defendant as Servicer for this securitization with respect to internal ratings, monthly reviews and annual reviews all paralleled the procedures followed by BNY Asset Solutions, LLC ("BNYAS"), the affiliate of BNYM which was the Servicer for the three Brooke Securitizations structured in 2003-04 (and still in existence during this period) (Answer ¶¶ 111, 118 below). Defendant denies that any shortcomings in the annual review process or any errors or inaccuracies in the assignment of internal ratings caused any damage to plaintiffs.

      60.    Defendant denies the allegations of Paragraph 60 of the Complaint as phrased but admits that a listing of expenses provided at the time of the June 2008 Certificate reported that the Franchisor was seeking to collect, from the Loan proceeds that were to be distributed by the Trustee in accordance with SSA § 4.6, additional "Collateral Preservation" fees with respect to eight Borrowers, and that the Franchisor elsewhere explained that these Borrowers were receiving "Level III" services for which, the Franchisor asserted, it was entitled to additional fees ("CPA Fees"). This information about the claimed CPA fees was provided for the first time in the monthly report with the June 2008 Certificate because it was in this time

period that the Brooke Entities had asserted that such CPA Fees were payable from the Section

4.6 "waterfall" as charges for expenses. Defendant states that the Servicer had no obligation

under the SSA to report the level of Loan Mitigation Assistance being provided by Franchisor to

Borrowers, and that neither plaintiff had inquired of Servicer about the extent of Loan Mitigation

Assistance being provided to Borrowers prior to April 2008 (and defendant denies that any

information provided in that regard by Servicer was inaccurate).    Defendant also states that

under the terms of 2006-1 SSA Schedule C-1, Loss Mitigation Assistance was to be provided to

all Borrower-Franchisees with a rating other than "Pass," but that assigning a "Fail" rather than a

"Watch" rating did not affect the level of Loss Mitigation Assistance that could be made

available by the Franchisor.    Finally, defendant states that of the eight distinct agencies listed in

Paragraph 60 of the Complaint, six were already rated "Fail" (three of these having already been

segregated as Liquidated Loans), and an additional one was already rated "Watch" in the Credit

Review worksheet for the preceding month.

      61.    Defendant denies the allegations of Paragraph 61 of the Complaint.

Defendant states on information and belief that all Loans were "performing loans," in terms of

the full payment of interest and principal on their behalf, except those Loans properly reported in

this June 2008 or prior certificates as Liquidated Loans or "Delinquencies," and defendant denies

that there was in the 2006-1 SSA any standard of "acceptable financial status" for individual

Borrower-Franchisees other than the absence of a default as to payment. Defendant also denies

the implication that plaintiffs were not aware of what they now would label the "nonperforming"

condition of a number of Loans in the 2006-1 Asset Pool until they received the June 2008

Certificate. Defendant refers to Answer ¶¶ 186-99 below, and states that an officer of UniCredit

was in direct discussions with Brooke Entities about the status of various Loans no later than

April 2008 (and in that period that officer made at least one visit to Brooke's offices to review Loan files and obtain other information about the financial condition of Borrower-Franchisees).

       62.    Defendant denies the allegations of Paragraph 62 of the Complaint except as stated in answer to the next paragraph of the Complaint and states (i) that plaintiffs have failed to identify any specific instances of the improper modification or discharge of one or more Loans, (ii) that plaintiffs have failed to plead how any such actions actually damaged plaintiffs and (iii) that plaintiffs have failed to specify any "misappropriation" of funds other than the $8,534 addressed in the next paragraph of the Complaint, which misappropriation TBS itself identified and subsequently remedied.

      63.    Defendant admits the allegations of Paragraph 63 of the Complaint and states that TBS subsequently reimbursed the MRTA for this amount, plus interest.

      64.    Defendant admits the allegations of Paragraph 64 of the Complaint, but, in the absence of any relevant details being pleaded by plaintiffs, denies that the Orr email or the email to which Mr. Orr was responding related to any specific Loans in the 2006-1 Asset Pool. Defendant also states that, whatever Mr. Orr may have said, at that time employees of Aleritas did report what was happening to outside parties.

      65.    Defendant admits the allegations of Paragraph 65 of the Complaint, but denies that the Lowry email or the email to which he was responding related to Loans in the 2006-1 Asset Pool, and states that the Southwest Agency loan was not in the 2006-1 Asset Pool or in the Asset Pool for any other securitization for which TBS was the Servicer. Defendant states on information and belief that the Southwest Agency loan was part of an early securitization for which BNYAS, the affiliate of BNYM, was the Servicer.

66.    Defendant admits the truth of the allegation in Paragraph 66 of the Complaint, but states that Mr. Orr did not make any specific admissions about "misappropriation of funds" that should have been directed to the 2006-1 Securitization.

67.    Defendant admits the allegations of the first and second sentences of Paragraph 67 of the Complaint (except to note that Robert Orr is not a defendant in this case), but lacks knowledge or information sufficient to form a belief as to how this concretely affected the MRTA or the 2006-1 Collection Account or the payment of amounts due the 2006-1 Noteholder in that period.  Defendant states that Mr. Orr's temporary success in thus diverting funds was the consequence of BNYM's failure to fulfill its duties as Master Agent Trustee (see Answer ¶¶ 71-78 below).  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the third sentence of said paragraph and notes that plaintiffs have not pleaded any specific information as to how the Certificate for the 2006-1 Securitization may have been "inaccurate" in this period.

68.    Defendant admits the allegations of Paragraph 68 of the Complaint, but refers to the SEC Complaint for its specifics as to "defalcations in loan servicing" and otherwise and states that the SEC Complaint does not contain any allegations that appear to provide concrete information about "defalcations in loan servicing" applicable to the 2006-1 Securitization as that might affect the Indenture Trustee or the Noteholder.

69.    Defendant denies that Paragraph 69 of the Complaint accurately summarizes the content of SEC Complaint ¶ 102 as it would apply to the 2006-1 Securitization or similar securitizations.  In particular, the SEC is therein referring not only to loans sold to securitizations but also to loans sold in other credit facilities.  The statements in SEC Complaint ¶ 102 to the effect that "Aleritas was obligated to receive . . . periodic loan payments" is not

accurate with respect to the 2006-1 Securitization and other similar securitizations, where the periodic loan payments were not directed to Aleritas but expected to be funded through the sweeping of Sales Commissions and the deposit or transfer of such directly into the MRTA as set out in the MASA and described above. However, in these securitizations Aleritas might receive funds to cure a potential delinquency, or as the result of the payoff of a Loan (for example, on the sale of an Insurance Agency) or possibly from collateral liquidations, and to that extent the SEC Complaint ¶ 102 correctly states with respect to such securitizations that "Aleritas was obligated to remit borrower payments promptly," although the required remittance was not "to the owners of the loans" but rather to the Collection Account pursuant to 2006-1 SSA § 4.2(a).

70.    As to the first sentence of Paragraph 70 of the Complaint, defendant refers to its answer to the preceding paragraph and denies the allegation in said sentence because of the lack of specificity as to the "obligations" and how these might relate to securitizations where TBS was the Servicer or in particular to the 2006-1 Securitization. Defendant admits that the second sentence of said paragraph accurately quotes SEC Complaint ¶ 103, states that the allegations in the SEC Complaint provide no concrete information about "fraudulent diversion" as that might affect the 2006-1 Securitization, and denies that any further answer is required.

71.    Defendant admits that SEC Complaint ¶ 104 alleges that "Orr and Hess continued this practice" as set forth therein. Defendant otherwise is required to deny the allegations of Paragraph 71 of the Complaint because of the vagueness of the general reference to "the fraud."

72.    Defendant admits that SEC Complaint ¶ 108 makes the allegation set forth in Paragraph 72 of the Complaint, but defendant otherwise lacks knowledge or information

sufficient to form a belief as to the truth of this allegation, and defendant states that the SEC

Complaint does not allege any specific diversion with respect to the 2006-1 Securitization.

73. Defendant denies the allegations of Paragraph 73 of the Complaint and

states that plaintiffs have failed to plead in what alleged manner "TBS failed to realize on the

Collateral" for any specific Loan in the 2006-1 Asset Pool or to identify any specific Loan or

Borrower-Franchisee where the Collateral other than the Sales Commissions (which were swept

into the MRTA controlled by BNYM as Master Agent Trustee and hence could not be "realized

on" by the Servicer) actually had "significant value." Defendant refers to its answer to

Complaint ¶ 74 below (as to the circumstances under which the Servicer is allowed to initiate

liquidation of Loan collateral). Defendant also refers to its answer to Complaint ¶ 40 above,

stating that pursuant to 2006-1 SSA Schedule C-1 the liquidation of collateral for Borrower-

Franchisees was the responsibility of the Master Agent; as plaintiffs plead in Complaint ¶ 42

above, that responsibility was delegated to the Master Agent Servicer. Defendant further states

that, commencing in September 2008, plaintiff UniCredit insisted upon taking over and totally

controlling all dealings with Borrower-Franchisees and all efforts to "realize on the Collateral"

for such Loans (see Answer ¶¶ 209-10 below) and that UniCredit continued that control after

BNYM apparently took over ownership of the Collateral in December 2008 pursuant to

N.Y.U.C.C. § 9-620.

74. Defendant admits the allegations in the first sentence of Paragraph 74 of

the Complaint insofar as "specific financial performance criteria" is intended to mean the

"debt/revenue" ratio and other calculations specified in Schedule C-1 and denies the remaining

allegations in said paragraph, stating (i) that TBS was only authorized to "realize on the

Collateral" where a borrower had failed to make payments due on the Loan and "Servicer has

determined that payments thereunder are not likely to be resumed" (2006-1 SSA § 3.3) and (ii) that, pursuant to SSA Schedule C-1, with respect to Borrower-Franchisees it was specifically provided that, while the Servicer should be prepared to declare defaults and deliver default notices, the "liquidation of collateral is completed by Master Agent" (which, as plaintiffs knew, had delegated this responsibility to the Franchisor as Master Agent Servicer, see Complaint ¶ 42).

75.   Defendant admits the allegations of Paragraph 75 of the Complaint.

76.   Defendant admits the allegations of Paragraph 76 of the Complaint.

77.   Defendant admits the allegations of Paragraph 77 of the Complaint (this case is referred to herein as the "BNYM  Kansas Action").

78.   Defendant admits the allegations of Paragraph 78 of the Complaint.

79.   Defendant admits the allegations of Paragraph 79 of the Complaint.

80.   Defendant admits the allegations of Paragraph 80 of the Complaint.

81.   With respect to the allegations of Paragraph 81 of the Complaint, defendant admits that receipts of Sales Commissions by BNYM declined precipitously in August 2008 when the Franchisor began to re-direct Sales Commissions away from the MRTA and this was not caught immediately because of the gross negligence of BNYM, and defendant also admits that Sales Commissions declined precipitously in October 2008 after many of the Borrower-Franchisees were forced to close because of plaintiffs' refusal to disburse funds from the MRTA that were due to such franchisees.

82.   Defendant admits the allegations of Paragraph 82 of the Complaint and incorporates by reference its answer to Complaint ¶ 11.

83. Defendant admits the allegations of Paragraph 83 of the Complaint. As set out below, although TBS remains the Servicer, plaintiffs have interfered with the Servicer's efforts to perform its duties in collecting information from the Borrowers and in other regards, and BNYM (at the direction of UniCredit) has refused to pay to TBS amounts due to TBS for its services, in direct violation of SSA § 4.6.

84. In answer to Paragraph 84 of the Complaint, defendant incorporates by reference its above answers to Complaint Paragraphs 1- 83.

85. Defendant denies the allegations of Paragraph 85 of the Complaint and refers to its answers above to paragraphs 58-74 of the Complaint.

86. Defendant denies the allegations of Paragraph 86 of the Complaint and further states that its potential liability pursuant to the 2006-1 SSA is in all respects limited as set forth in Section 7 and elsewhere in the SSA. Defendant states that plaintiffs have not identified any specific item of "direct loss" anywhere in the Complaint as having been caused by defendant and that plaintiffs also have not identified any specific, unremedied "misapplication of funds" or "loss of loan payments" or "loss of collateral" attributable to TBS as Servicer.

87. Defendant denies the allegations of Paragraph 87 of the Complaint, and denies that the internal ratings of individual Borrower-Franchisees in this Asset Pool had any necessary or apparent connection to "the decline in the Brook Entities' business" (as distinguished from each such Borrower's business). Defendant also denies that plaintiffs "could have undertaken actions" of the sort described in the absence of an Event of Default under the Indenture and denies that any alleged shortcoming in the internal ratings would constitute an Event of Default under the Indenture. Defendant states that plaintiffs have not pleaded how any specific internal rating for any Borrower was inaccurate, or how actions that plaintiffs "could

have undertaken" with respect to the Brooke Entities might have had a positive effect on the Sales Commissions and other Collateral provided by the Borrower-Franchisees. With respect to the claim for "consequential loss," defendant also states that section 7.1 of the 2006-1 SSA provides in part "Notwithstanding anything contained in this Agreement, the Servicer shall not be liable for any special, incidental or consequential damages arising in connection with the performance of its duties hereunder."

88.    With respect to Paragraph 88 of the Complaint, defendant admits that it has the obligations set forth in 2006-1 SSA §§ 7.1(c) and (d), subject to the other provisions of Section 7 of the 2006-1 SSA and the other provisions of the 2006-1 SSA and the defenses set forth herein, and otherwise denies the allegations of said paragraph.

89.    Defendant denies the allegations made in Paragraph 89 of the Complaint.

90.    In answer to Paragraph 90 of the Complaint, defendant incorporates by reference its above answer to Complaint Paragraphs 1- 89.

91.    Defendant denies the allegations of Paragraph 91 of the Complaint and further states that its only obligations with respect to the 2006-1 Securitization, whether owed to the Issuer or owed to others, were the contractual obligations set forth in the 2006-1 SSA and that its liability pursuant to the 2006-1 SSA is in all respects limited as set forth in Section 7 and elsewhere in the SSA, and further limited or barred by the defenses set forth herein.

92.    Defendant denies the allegations of Paragraph 92 of the Complaint and further states that its only obligations with respect to the 2006-1 Securitization, whether owed to the Issuer or owed to others, were the contractual obligations set forth in the 2006-1 SSA, applying the standard set therein, and that its liability pursuant to the 2006-1 SSA is in all

respects limited as set forth in Section 7 and elsewhere in the SSA, and further limited or barred by the defenses set forth herein.

93.    Defendant denies the allegations made in the first sentence of Paragraph 93 of the Complaint.  Defendant also states, on information and belief, that it followed the same standards and procedures established and employed by BNYAS, BNYM's affiliate, as the Servicer in other Brooke securitizations.  Defendant also denies the allegations in the second sentence of said paragraph and states that its liability is limited to the contractual obligations set out in the 2006-1 SSA and that it bears no liability of any kind for the "negligence of Aleritas."

94.    Defendant denies the allegations of Paragraph 94 of the Complaint and, with respect to the second sentence of said paragraph, also incorporates by reference its above answers to Complaint ¶¶ 57-59.

95.    Defendant denies the allegations of Paragraph 95 of the Complaint.

96.    Defendant denies the allegations of Paragraph 96 of the Complaint.

97.    Defendant denies the allegations of Paragraph 97 of the Complaint.

98.    Defendant denies the allegations of Paragraph 98 of the Complaint.

99.    With respect to Paragraph 99 of the Complaint, defendant admits that it has the obligations set forth in 2006-1 SSA §§ 7.1(c) and (d), subject to the other provisions of Section 7 of the 2006-1 SSA and the other provisions of the 2006-1 SSA, and the defenses set forth herein, otherwise denies the allegations of said paragraph.

100.    Defendant denies the allegations of Paragraph 100 of the Complaint.

DEFENDANT'S ADDITIONAL ALLEGATIONS SUPPORTING
ITS AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

<u>The Brooke Entities</u>

101.    Brooke Capital Corporation (formerly Brooke Franchise Corporation) ("Franchisor") is a Kansas corporation headquartered in Kansas. The Franchisor was a publicly traded company that was listed on the American Stock Exchange under the symbol "BCP."

102.    Brooke Corp. is a Kansas corporation headquartered in Kansas. Brooke Corp. was a holding company listed on the NASDAQ Global Market under the symbol "BXXX". Among other interests, Brooke Corp. owns 81 percent of Franchisor.

103.    The Franchisor and approximately thirty other affiliated companies were engaged primarily in the business of selling insurance and related services through franchisees and company-owned locations. At its peak in 2007-08, Franchisor had over 900 locations. Most of the companies' revenues traditionally derived from sales commissions on the sale of property and casualty insurance policies through its franchisees, and consulting, lending and brokerage services provided to franchisees, funeral homes and Allstate insurance agencies.

104.    The Franchisor created new franchises in two ways: (1) converting an existing unaffiliated agency ("Conversion Franchise"), or (2) starting a new franchise ("SUP"). Once the Franchisor identified an interested buyer for a potential Conversion Franchise, the Franchisor and the buyer would enter into a franchise agreement and purchase agreement for the acquisition of the agency. In a SUP, the Franchisor would identify a prospective franchise location and prospective franchisee, enter into a franchise agreement and then assist the franchisee in opening the new location.

105.    Pursuant to the franchise agreement, the new franchisee agreed to pay various initial and "assistance" fees, and to share a percentage of its sales commissions with the

30

Franchisor (or, later, with the separate Brooke entity that nominally served as "Master Agent" for certain insurance business), and to pay other fees specified in the franchise agreements going forward. Franchisees typically relied on the Franchisor for various "back office" services (including bookkeeping and cash management) and wrote insurance under the sponsorship of a licensed affiliate of the Franchisor as "Master Agent."

106.   Aleritas Capital Corporation (formerly Brooke Credit Corporation) ("Aleritas") is a Delaware corporation headquartered in Kansas, which was 62% owned by Brooke Corp. (Brooke Corp., the Franchisor and Aleritas are collectively referred to herein, and in the Complaint, as the "Brooke Entities.") Aleritas was engaged in the business of lending to Brooke franchisees, other insurance agents and funeral homes.

107.   The costs associated with the acquisition or start-up of an agency by a franchisee, the various initial fees paid by the franchisee to the Franchisor and, often times, additional working capital for the franchisee would all typically be financed by the franchisee through Aleritas, with the franchisee pledging its sales commissions and any other assets as collateral.

108.   Brooke Corp. and the Franchisor (collectively, "Brooke") filed Chapter 11 petitions on October 28, 2008 in the United States Bankruptcy Court for the District of Kansas. On June 29, 2009, the Bankruptcy Court entered an Order converting the Chapter 11 proceedings to Chapter 7 proceedings (see Complaint ¶¶ 78-80). The consolidated case remains open. Aleritas is no longer engaged in business, but it is not included in the Kansas Chapter 7 proceedings.

The Securitizations

109.   Prior to 2003, Aleritas employed a business model whereby it would fund loans by selling participation interests in individual loans to a network of local banks.  In 2003, Aleritas started using loan securitizations in addition to loan participations.

110.   Loan securitizations are financing structures that aggregate assets (in this case, loans previously made by Aleritas, together with the security originally pledged for those loans) into a pool of collateral and then issue new securities (in this case, notes) backed by the asset pool (here, the original loans and related collateral).  The securities are then sold to investors, typically financial institutions, with the return on the investment (in this case, interest and repayment of principal) to come from the cash flow expected to be generated by the asset pool (in this case, borrower payments on the original loans, funded in turn by the borrowers' insurance brokerage commissions).

111.   In a typical Brooke securitization, the parties included:

a.   Seller: Aleritas had made the loans that were to be "securitized" and initially held the borrower promissory notes that would later form the asset pool on which the securitization was premised.

b.   Issuer: A bankruptcy-remote, special-purpose entity ("SPE") would be created for each securitization, and it would acquire a package of loans that had been originated through Aleritas.  Many of the packaged loans would be loans made to Brooke franchisees ("Franchisees"), but some securitizations (including the 2006-1 Securitization) also included loans made by Aleritas to independent Allstate insurance agents, or other forms of loans.  The package of loans ("Asset Pool") would then be the primary collateral for the note to be issued by the Issuer to one or more investors.

c.   Servicer: BNY Asset Solutions, LLC ("BNYAS") for the first three securitizations, and Textron Business Services, Inc. ("TBS") for the remaining securitizations, would act as "Servicer," performing various reporting, calculations and

other functions specified in a Sales and Servicing Agreement.  In all these transactions the Servicer then engaged Aleritas (which was necessarily directly familiar with each loan as the originator of the loan) to perform various duties related to the "servicing" functions, under a Subservicing Agreement.

d.   Master Agent: Brooke Agency Services Company LLC ("BASC"), a bankruptcy-remote special-purpose entity served as Master Agent for all of the securitizations and was the Master Agent for the franchisees in their insurance operations.  It nominally had a central role in the collection of the franchisees' sales commissions, which were pledged as collateral for their loans and were to be the primary source of cash flow to pay the notes to be issued by the Issuer.

e.   Master Agent Servicer: Brooke Corp. and later the Franchisor (Brooke Capital Corp.) served as Master Agent Servicer on the securitizations, essentially carrying out all of BASC's functions.

f.   Trustees: The Bank of New York Mellon ("BNYM") served as Master Agent Trustee for all of the securitizations, including the 2006-1 Securitization.  As Master Agent Trustee it had a central role in, and control over, the collection of sales commissions into a centralized account, directly and through BASC, and in the allocation of the collected cash to BASC (as payment for being the Master Agent), to the various securitization pools and to the various individual agents whose loans and sales commissions were the collateral.  BNYM also served as Indenture Trustee in those securitizations which used that structure (as the 2006-1 Securitization did).  As Indenture Trustee it held the assignment of the collateral from the Issuer.

g.   Noteholders: The parties which purchased the notes issued by Issuer.

112.   On information and belief, by the end of 2007, approximately 45% of the total loans Aleritas had initiated had been securitized in a series of eight securitizations.

113.    In a given securitization, Aleritas would sell and assign all of its right, title, and interest in a pool of commercial loans primarily to insurance agents and agencies ("Borrowers" and, where applicable, "Borrower-Franchisees") to an SPE.

114.    The SPE would issue one or more series of asset-backed notes (the "Notes"), which would be backed by and repaid from revenue (loan payments) generated by the loans in the pool, collected by sweeping all the sales commissions due to the Borrowers ("Sales Commissions") and certain other funds into segregated accounts and then having BNYM subtract each Borrower's loan payments and other specified amounts from the gross collections before turning the remaining net revenue over to the individual Borrowers or the Franchisor as their agent.

115.    The Franchisor would assign to BASC (the Master Agent) all its rights and obligations under the Brooke Franchise Agreements and the Collateral Preservation Agreements related to the loans, and the Borrower-Franchisees would agree to route all of their own collections and all Sale Commissions due to them from insurance agencies through the special segregated accounts.  In addition, Brooke Corp. (and later the Franchisor) would serve as Master Agent Servicer and provide collection, distribution, accounting, and related services to BASC with respect to debt service on the loans as well as provide "loss mitigation assistance" pursuant to the Collateral Preservation Agreements relating to Borrower-Franchisees.

116.    The SPE would pledge the loans and other collateral to BNYM as Trustee for the benefit of the Noteholders and other parties identified in the securitization transaction documents.  In addition, BASC would grant to BNYM as Master Agent Trustee a security interest in the gross Sales Commissions attributable to the Borrower-Franchisees, originally pledged by the Borrower-Franchisees as security for their loans.

117.   As described in more detail in Paragraphs 129-40 below, the gross Sales Commission revenues (as well as certain premiums collected from Franchisee customers and due to insurance companies) would ultimately be deposited into a "master receipts" trust account ("MRTA") maintained at BNYM in the name of BASC but controlled and managed by BNYM as the Master Agent Trustee.  A single MRTA account was used for all the securitizations, and BNYM was both to allocate the receipts for each Borrower-Franchisee within the MRTA and to segregate the portion to be applied to loan payments for subsequent transfer into the separate Collection Account established for each securitization, which accounts were also controlled by BNYM.

118.   Prior to 2006 the Brooke Entities had completed five securitizations of loans in the following total loan amounts:

| | |
|---|---|
| April 2003 ("2003-1"): | $15,825,000 |
| November 2003 ("2003-2"): | $23,526,006 |
| June 2004 ("2004-1"): | $24,832,000 |
| March 2005 ("2005-1"): | $40,992,515 |
| December 2005 ("2005-2"): | $64,111,000 |

In each securitization BNYM was the Indenture Trustee and Master Agent Trustee.  In the first three transactions, BNYAS was the Servicer and BNYAS contracted with Aleritas to perform certain related functions (as "Subservicer").  In the 2005-1 and subsequent securitizations, including the 2006-1 Securitization, TBS was the Servicer, and it also contracted with Aleritas to perform certain related functions as Subservicer.

119.   In each securitization the face value of the Note issued by the Issuer was approximately 75-85% of the total loan obligations.  For example, the principal amount of the Note for the 2005-1 securitization was $32,000,000 (78%) and the principal amount of the Note

for the 2005-2 securitization was $51,500,000 (80%). The difference was the "over-collateralization" or "collateral cushion," which effectively meant that the Issuer would absorb some level of losses on the loans before the Noteholders would suffer a loss on their Notes.

The 2006-1 Securitization

120.    On July 1, 2006, Aleritas sold approximately $65,433,000 of loans (the "Loans") to a bankruptcy remote, special purpose entity named Brooke Securitization Company 2006-1, LLC ("SPE-6"). The securitization transaction known herein as the "2006-1 Securitization" was thereupon closed pursuant to an extensive set of transaction documents. The President of SPE-6 was Michael Lowry, who was also President of Aleritas. Mr. Lowry signed various 2006-1 Securitization documents on behalf of SPE-6 and on behalf of Aleritas.

121.    SPE-6 sold the entire 2006-1 Securitization Note in the amount of $52,346,089 to BFFC, the affiliate of plaintiff UniCredit identified in Answer ¶ 1.

122.    As part of the 2006-1 Securitization transaction, SPE-6, Aleritas and TBS entered into a Sale and Servicing Agreement dated July 1, 2006 (above defined as the "2006-1 SSA" and attached as Exhibit 2 to the Complaint). A portion of that agreement specifies what role TBS was to have in, among various things, assembling monthly information about the Loans payments and supplying that information and a variety of calculations based thereon to various parties, computing the way the Loan proceeds to be received and held by BNYM were to be distributed under the "waterfall" set out in 2006-1 SSA § 4.6, calculating certain financial ratios about the specific Borrowers, and dealing with Loans in delinquency or default.

123.    Pursuant to a Subservicing Agreement dated July 1, 2006 (above defined as the "Subservicing Agreement" and attached as Exhibit 3 to the Complaint), TBS contracted with Aleritas to perform certain functions as set forth therein. (There was also a separate

agreement covering the somewhat different procedures to be followed for the loans to non-franchisee Allstate agents.) Aleritas was this "Subservicer" in all of the securitizations, having dealt with each borrower in the course of initiating the loans that were packaged in these securitizations. Mr. Lowry was the person at Aleritas with direct supervision and control over the work Aleritas performed under the Subservicing Agreement.

124.   Also as part of the 2006-1 Securitization transaction, BASC and BNYM entered into a Master Agent Security Agreement dated July 1, 2006 (above defined as the "MASA"), whereby, among other things, BASC granted to BNYM as Master Agent Trustee a security interest in the Sales Commissions attributable to the Brooke Agents whose Loans were in the 2006-1 Asset Pool.  (A true copy of the MASA is Exhibit B hereto.)  As described in greater detail in Paragraphs 129-40 below, the MASA specifies how the gross Sales Commissions were to be collected or aggregated by BASC, transferred to the MRTA and then segregated and allocated by BNYM.  SPE-6 also granted BNYM, as Indenture Trustee, a security interest in the Loans and various related documents and other collateral ("Collateral").

125.   As set forth below, in or about December 2008 (and hence shortly after the events that are the immediate subject of this dispute), BNYM apparently carried out a "strict foreclosure" on the 2006-1 Securitization Collateral using the "notice" procedure of N.Y.U.C.C. § 9-620, pursuant to which BNYM would have become the owner of the Loans, taken in full satisfaction of the remaining principal and interest obligations on the Note.

Subsequent Securitizations

126.   The Brooke Entities completed two additional securitizations after the 2006-1 Securitization that is the subject of this lawsuit, one later in 2006 and the last in 2007.

37

These two securitizations were referred to as "warehouse facilities" because loans could be added to or removed from the asset pool.

127.    The first warehouse facility had already been established in August 2004, but was amended August 29, 2006 (the "2006-2 Securitization"). Aleritas sold a group of loans to the SPE created for this facility, which pledged the loans to DZ Bank as Agent for the lender, Autobahn Funding Company LLC. BNYM acted as Master Agent Trustee; BASC was the Master Agent; the Franchisor was the Master Agent Servicer; TBS was the Servicer; and Aleritas was the Subservicer. The 2006-2 Securitization used the CRTA and MRTA along with the other Brooke securitizations, and BNYM had similar duties as Master Agent Trustee.

128.    The other warehouse facility was established in September 2007 and amended twice, with the second amendment effective December 10, 2007 (the "2007-1 Securitization"). Aleritas sold a group of loans to one SPE; this entity then transferred a "senior participation interest" in the loans to a second SPE, which became the Issuer and which pledged the loans to BNYM as Indenture Trustee. BNYM also acted as Master Agent Trustee; BASC was the Master Agent; the Franchisor was the Master Agent Servicer; TBS was the Servicer; and Aleritas was the Subservicer. The 2007-1 Securitization also used the CRTA and MRTA along with other Brooke securitizations, and BNYM had similar duties as Master Agent Trustee.

The Flow of Sales Commissions
to BNYM as Master Agent Trustee

129.    The Franchisees had pledged their Sales Commissions (less the percentage due the Master Agent) as collateral for their Loans. With some insurance carriers, the agent collected the full premium from the customer. Under the insurance laws of most states, this money is deemed to be received "in trust" for the benefit of the insurance company and the insured. The Franchisees' franchise agreements provided that all monies received by Franchisees

were to be delivered to an individual Receipts Trust Account for each Franchisee, held at a local bank. BASC (through Franchisor as Master Agent Servicer) was then required to sweep those amounts "relating to the Brooke Insurance Loans" directly, without deposit into any intervening account, into the Consolidated Receipts Trust Account ("CRTA"), a specific account at The First National Bank & Trust, Phillipsburg, Kansas owned by BASC, in which BNYM as Master Agent Trustee had a security interest. In other instances, insurance carriers billed the premium directly to the insured, collected the premium, and remitted the portion of the premium constituting the agent's commission to the CRTA; BASC was required to arrange for commissions paid by insurance companies in respect of franchisee agencies to be deposited directly to the CRTA.

130.    Whatever the source of the deposits into the CRTA, BASC was required to transfer within one business day all sums on deposit in the CRTA, without deposit into any intervening account, to the MRTA (master receipts trust account) at BNYM, owned by BASC under the control of BNYM as Master Agent Trustee, and in which BNYM as Master Agent Trustee had a security interest. MASA §§ 3.1, 3.2. (Commission amounts owed to non-franchisee Allstate agents were received by BNYM directly from Allstate and deposited in a separate trust account dealt with in MASA § 3.6.)

131.    If payments from insurance companies or franchisee agencies were received directly by BASC, as opposed to paid into the CRTA or into the MRTA, then BASC was obligated to deposit the same into the MRTA "without transfer into any intervening account." MASA § 3.2.

132.    Thus, the Franchisees did not control the application of Sales Commissions to the payment of their Loans. Rather, MASA § 3 established procedures as to

how BNYM, the Master Agent Trustee, would take the sums held in the single MRTA that was used for all the securitizations, set aside Sales Commissions "with respect to each Brooke Insurance Agent," and allocate or apply the resulting amounts for each Borrower-Franchisee. The first steps in this procedure applied across all the securitizations.

133.   Pursuant to MASA § 3, BNYM was required to set aside each Borrower-Franchisee's Sales Commissions held in the MRTA on a franchisee-specific basis on each business day as follows: (a) set aside an amount equal to the Master Agent's "share of such Sales Commissions" calculated under the franchise agreements (MASA § 3.2(a)); then (b) set aside the amounts due as Loan payments for each Borrower-Franchisee (MASA § 3.3(b)); then (c) set aside any other amounts due from such Borrower-Franchisee to other lenders (that is, for other, presumably subordinated, loans that each Franchisee might have) (MASA § 3.3(c)); and then (d) set aside for or distribute any remaining Sales Commissions due "to such Brooke Insurance Agent" in the manner provided in its franchise agreement (this daily borrower-specific "set aside" process is hereinafter referred to as the "Commissions Accounting").

134.   The final amount set aside for an agent under MASA § 3.3(d) essentially constituted the individual agent's actual operating cash flow, from which operating expenses and payroll would be paid and any profit would be derived.

135.  Under MASA § 3.5, BNYM was required to transfer funds that had been set aside pursuant to MASA § 3.2(b) (i.e., the amounts posted toward each specific Borrower-Franchisee's Loan payments) to the appropriate securitization's Collection Account held in the name of BNYM as Indenture Trustee for that securitization within two business days after the deposit of such funds in the MRTA, for eventual disbursement by BNYM in accordance with the priority of payments set in 2006-1 SSA § 4.6, including monthly payments of certain fees and the

payment of interest and principal on the relevant Note (the payments according to such priorities is referred to as the "waterfall") .   (If the Loan payments exceeded the amount necessary to pay the current Note obligations and certain other payments in the "waterfall," these surplus funds would flow to the Issuer or, depending on specific "triggers" negotiated in each securitization, be applied to further reduce the principal balance on the Notes (2006-1 SSA § 4.6(xii)).

136.   A chart of the flow of funds provided for the 2006-1 Securitization is attached hereto as Exhibit C.

137.   BNYM made the transfers to the specific Collection Accounts periodically (rather than within the two business days set by MASA § 3.5).  TBS provided BNYM with confirmation of the monthly gross amount that should be (or, more precisely, should already have been) transferred to each Collection Account for each securitization where TBS was the Servicer, using information about the Loan payments assembled by Aleritas.

138.   Under this system, the single MRTA controlled by BNYM received funds for all the securitizations, in amounts vastly in excess of the amount necessary to pay the monthly debt service on the Notes in these securitizations.  As much as $180,000,000.00 per month moved in and out of the MRTA under the required supervision and direction of BNYM. In effect, BNYM served as the air traffic controller of the MRTA, and the Commissions Accounting was to be the contractual mechanism for directing (i) the current loan payment funds for each Borrower-Franchisee to the correct Collection Account for each securitization; (ii) the percentage of Sales Commissions due the Master Agent under that agent's franchise agreement, which went to the Master Agent Servicer; and (iii) the funds to be applied for or distributed to each individual agent for its other debt, operating expenses and profit (these amounts were usually to be routed through the Franchisor).

139.    Even if BNYM failed to perform the Commissions Accounting process every business day (as the MRTA required), so long as BNYM properly monitored activity in the MRTA and performed the Commissions Accounting and related set-asides required by MASA § 3.2 (and similarly required in each of the other securitizations) at least once a month, in anticipation of the end of the month, BNYM would necessarily know at the end of each month for the 2006-1 Securitization (and similarly for the other securitizations): (i) the total Sales Commissions collected for each Borrower-Franchisee; (ii) whether that Borrower-Franchisee's Sales Commissions (net of the percentage owed to the Master Agent) were sufficient to pay its Loan obligations; and (iii) whether a Borrower-Franchisee had earned sufficient net Sales Commissions so that, after making its Loan payment, funds were available for operating expenses and profit.  Thus, the effect of the Commissions Accounting (and the related set-asides) would be to give BNYM as Master Agent Trustee a complete snapshot for each 2006-1 Securitization Borrower-Franchisee of its Sales Commissions, its resulting Loan payments, and the surplus (if any) for operations and profit, all based on actual sales commissions received for that agency.  Moreover, BNYM would know each month for each Borrower-Franchisee whether its net Sales Commissions had been sufficient to meet its Loan obligations or whether some supplemental payment had been required to avoid a default in payment on its Loan.

140.    Thus, the Commissions Accounting was also an invaluable tool for monitoring the gross and net revenues, Loan payments and net residual amounts due for each Borrower-Franchisee in the 2006-1 Securitization (and in other securitizations as well), as well as monitoring the collective "financial health" of the Asset Pool as a whole, and this function was exclusively the responsibility of the Master Agent Trustee.

BNYM's Abandonment
of its Contractual Duties

141.    Prior to the execution by TBS of the 2006-1 SSA, BNYM had abandoned

its duties as Master Agent Trustee under the earlier securitizations, which contain similar

provisions concerning the CRTA and MRTA.  Rather than account for the Sales Commissions of

each Brooke Insurance Agent on each business day, as the Master Agent Trustee was required to

do, or even just perform the Commissions Accounting at the end of each month, BNYM simply

turned over to BASC or the Franchisor all of the amounts deposited to the MRTA, setting aside

only the aggregate amounts due for all Loan payments at the end of a month that would have to

be transferred to the Collection Accounts of specific securitizations.  This was absolutely not

what the MASA mandated, and BNYM did not reveal to TBS that BNYM had already

abandoned these duties and was not performing the Commissions Accounting.

142.    At the time that BNYM, TBS, the Noteholder and other parties entered

into the 2006-1 Securitization, BNYM knew that it had not been performing the accounting work

required of the Master Agent Trustee in the prior securitizations and knew that it did not intend

to perform the Commissions Accounting for the Sales Commissions received in connection with

the 2006-1 Securitization.  BNYM knew that in this regard it had been, and would be, simply

taking direction from the Franchisor about how the funds in the MRTA should be allocated, thus

effectively transferring control over those funds and decisions to the Franchisor when the MASA

procedures had been created to make sure such control and decisions were made by the Master

Agent Trustee.

143.    BNYM did not reveal this material set of facts to TBS or, it appears, to the

Noteholder.  TBS entered into the 2006-1 Securitization without knowledge of these material

facts, in reasonable reliance on BNYM's promise to perform the Master Agent Trustee functions.

144.    After the closing of the 2006-1 Securitization BNYM continued its

practice of not performing the Commissions Accounting and also failed to supervise and control

the MRTA, all now also in breach of its duties under the 2006-1 Securitization documents.

### Effects of BNYM's Willful Non-Performance of the Commissions Accounting and Related Set-asides

145.    If BNYM had carried out its duties as Master Agent Trustee, then it would

have been aware during the operation of the 2006-1 Securitization, through independent

information available only by monitoring and accounting for the MRTA (information not

available to TBS) that the gross Sales Commissions being collected by (or on behalf of) some

2006-1 Borrower-Franchisees had over time become reduced to the point where, even if still

sufficient to pay principal and interest on their individual Loans, the cash flow could not

reasonably support a viable business.  Had BNYM been properly performing the Commissions

Accounting, BNYM would have had this information on a borrower-specific basis for each

2006-1 Securitization Borrower Franchisee.  BNYM was grossly negligent in not knowing this

information, as the result of BNYM willfully failing to perform its contractual duties.

146.    BNYM did not advise TBS (or, so far as defendant is aware, the

Noteholder) of any deterioration in the financial condition of Borrower-Franchisees, either for

the franchisees with Loans in the 2006-1 Securitization at issue in this case or for those with

loans in the other securitizations.  If it were true, as plaintiffs allege, that the financial condition

of such Borrowers was not accurately or sufficiently described in the reports provided by TBS,

then the Commissions Accounting information which BNYM should have had available would

have provided the 2006-1 Noteholder with this (or other) information about the creditworthiness

of the Loans that UniCredit now alleges the Noteholder wanted (and would have acted upon).  If

plaintiffs have been injured in that regard (which is disputed), it is BNYM that proximately caused any injury that allegedly resulted.

147.    Commencing at some time in the middle of 2007, one or more Brooke Entities began to make payments into the MRTA in order to support the obligations of various borrowers to pay principal and interest ("P&I") on their respective loans when the net Sales Commissions of such borrowers (after deducting the Master Agent's percentage share) had become insufficient to meet their loan obligations.  Such transfers averted the occurrence of a default as to payment on such loans, because that borrower's loan payment was thereby fully funded with the assistance of this advance.  Over time these payments amounted to millions of dollars for the securitizations as a group.

148.    The need for such transfers might be considered to reflect negatively on the financial condition of such borrowers.  If BNYM had been performing the Commissions Accounting it would have had this information on a borrower-specific basis.

149.    Both the making of such transfers into the MRTA and the receipt of such deposits by BNYM as Master Agent Trustee were inconsistent with the system of transfers established by the MASA, and from BNYM's account records and its control of the MRTA BNYM had to know about these transfers.

150.    Even if BNYM was not doing the required Commissions Accounting, BNYM had to at least know that such transfers were occurring and had become necessary because the net commission revenues of *some* borrowers in *some* securitizations were no longer sufficient to meet such borrowers' P&I obligations under their loans – creating a shortfall in coverage for P&I and leaving such borrowers with *no* net revenue for operating expenses (much less any profit).

151.  TBS is not aware of the extent to which such large and frequent transfers were applied to cover P&I shortfalls for specific Loans in the 2006-1 Securitization (as opposed to shortfalls on loans in other securitizations).  However, BNYM should have had this specific information as a result of performance of the Commissions Accounting and as a result of its bank account records.

152.  Because BNYM had willfully failed to carry out its duties, it was grossly negligent in not being aware whenever any 2006-1 Borrower-Franchisee's net commission revenues fell below the level necessary to pay P&I on its Loan – the point at which *no funds whatsoever* would flow back to the account of that insurance agency to meet operating expenses, a fact which could indicate that any such Borrowers were in extreme business difficulty.

153.  In addition, BNYM either knew or was grossly negligent in not knowing whether any Borrowers in the 2006-1 Asset Pool (a) had become consistently unable to meet the P&I obligations on their loans from their net commission revenues and (b) were receiving little or no "net" funds from the MRTA to meet their other operation expenses.  If either circumstance applied to a Borrower in the 2006-1 Asset Pool, BNYM did not communicate such information either to TBS (or, so far as defendant is aware, to the Noteholder), and BNYM was grossly negligent in that regard.

154.  BNYM also did not advise TBS (or, so far as defendant is aware, the Noteholder) that Brooke Entities were making frequent, large deposits into the MRTA that were separate from Sales Commissions or that these deposits were necessary in order to meet the P&I obligations of borrowers in various securitizations, although BNYM necessarily knew of this situation based on its bank account records.

155.    In addition, because of the frequency and magnitude of these transfers into the MRTA, starting in June 2007 BNYM was necessarily aware that in the absence of these transfers there would have been events of default as to payment of P&I on specific loans in the various securitizations, and potentially also defaults on the scheduled payment of principal and interest on the Notes themselves.  If BNYM had performed the Commissions Accounting on at least a monthly basis, it would have known precisely to what extent this situation affected each securitization, including the 2006-1 Securitization.  BNYM did not inform TBS (or, so far as defendant is aware, the Noteholder) of any of these facts, and BNYM was grossly negligent in this regard.

156.    To the extent that plaintiffs now assert that they would have taken some action, or taken some action sooner, if they had been advised of the true financial condition of various 2006-1 Securitization Borrowers or if they had been advised of the extent to which collection of amounts due on the Notes was at risk, then BNYM is responsible for the consequences of such inaction, because BNYM knew of the transfers described above and also should have known, and would have been grossly negligent in not knowing, of the significance of such transfers as indicators of the possible financial deterioration of any specific 2006-1 Borrowers.

Additional, Related Gross Negligence of
BNYM as Indenture Trustee

157.    Pursuant to MASA § 8.1, the Master Agent Trustee was "to exercise such rights, remedies, powers and privileges hereunder, as the [Indenture] Trustee may direct in writing . . .  Unless otherwise specified herein, Master Agent Trustee shall act upon and in compliance with the written instructions of the Trustee delivered pursuant to this Agreement promptly following receipt of such written instructions."

158.    The securitization documents recognized that BNYM's roles as Master Agent Trustee and Indenture Trustee were merged into a single role in practice, and BNYM recognized this.  For example, when BNYM brought the BNYM Kansas Action as Indenture Trustee of two securitizations, one of which was the 2006-1 Securitization (Complaint ¶ 77), BNYM identified itself as Indenture Trustee (BNYM Kansas Action Complaint ¶ 4) and, rather than distinguishing its role as Master Agent Trustee, simply explained that "BNY[M] as Trustee is required to transfer funds from the Master Receipts Trust Account into the . . . 2006-1 Collection Account (or similar accounts set up in respect of the applicable Other Issues), for disbursement in accordance with the waterfall of payments . . ." (id., ¶ 43).  Such transfers were a function to be performed by the Master Agent Trustee under MASA § 3, and not technically the role of the Indenture Trustee.  But BNYM correctly saw no practical distinction between these two roles in practice, and, with BNYM wearing both hats, there was none.

159.    Because BNYM was both Indenture Trustee and Master Agent Trustee, the Indenture Trustee was at all times on actual notice that the Commissions Accounting was not being done by the Master Agent Trustee and of the other failures of the Master Agent Trustee to fulfill its duties and/or inform the Servicer and Noteholder of critical information.  As Indenture Trustee BNYM was grossly negligent or acted willfully in not instructing the Master Agent Trustee to perform its contractual duties, in not informing the Servicer and the Noteholder of these circumstances and in not taking action to protect the Collateral security it held from the effects of these circumstances.

160.    To the extent that BNYM as Indenture Trustee has failed to recognize the valid claims against that same institution as Master Agent Trustee, and has failed as an institution to remedy the damages suffered as a consequence by the Secured Parties defined in the Indenture

(including TBS and the Noteholder), this inaction also constitutes willful misconduct on the part of the Indenture Trustee.

Additional Impacts on TBS of BNYM's
Willful Failure to Perform Its Duties as Trustee

(a) Accurate Reporting of Delinquent Loans

161.    So long as principal and interest on a Borrower's Loan was being paid (whatever the source of payment), the Servicer has no authority under the 2006-1 SSA to declare the Loan in default for some other reason and "realize on collateral." Based on information supplied by Aleritas over the course of the 2006-1 Securitization, TBS had no reason to believe that specific Loans were in default except as TBS noted in the monthly report that TBS prepared and circulated, as set forth either in the Delinquencies section or in the classification of a Loan as a Liquidated Loan.

162.    Defendant has no basis for concluding that the reporting of delinquent loans or Liquidated Loans in its monthly reports was in error, and plaintiffs (despite using inapplicable, loaded terms like "nonperforming" (Complaint ¶ 61)) identify no such errors. If some Loan was, unbeknownst to the Servicer, in a delinquent status that had not been revealed by Aleritas in its reports to the Servicer, then this should still have been known to BNYM by its conduct of the Commissions Accounting and the related transfer of set-aside funds for each Loan to the 2006-1 Collection Account. At no time did BNYM inform TBS that its records revealed any Loan delinquency not identified in the Servicer's reports.

163.    Had BNYM identified any Loan as delinquent where TBS had been misinformed about the status of the Loan (if such was ever the case), then TBS would have been in a position to declare a default, classify the Loan as a Liquidated Loan, and initiate liquidation

of any collateral (exclusive of the Sales Commissions controlled by BNYM), if that was
financially justified, all as provided for under the 2006-1 SSA.

164.    Had BNYM informed TBS that the information being supplied to it
through Aleritas was in any respect inaccurate (if it was), then TBS would have initiated an
investigation of Aleritas' performance under the Subservicing Agreement, and, if these errors
were not satisfactorily explained, TBS would have terminated Aleritas as Subservicer even
earlier and thereafter would have performed all the servicing functions entirely on its own –
thereby avoiding whatever subsequent wrongdoing allegedly occurred that may be attributable to
Aleritas (which plaintiffs have asserted that TBS is liable for, but which plaintiffs have not
identified).

(b) The Role of Aleritas in the "Subsidy" Transfers

165.    Because Aleritas was providing services to TBS pursuant to the
Subservicing Agreement in the 2006-1 Securitization (and similarly providing services in other
securitizations), information that transfers were coming into the MRTA from the Franchisor or
Aleritas could have been of significance to TBS.

166.    Although there were circumstances where Aleritas, as Subservicer, was
expected to receive Borrower-related payments, generally in connection with a Loan pay-off (for
example, in connection with the sale of an agency) or as a result of collections on Loans in
default ("Liquidated Loans," as defined in the 2006-1 SSA), such sums were required to be paid
directly into the appropriate Collection Account (*not* into the MRTA) and to be credited
specifically against the appropriate Loan. If Aleritas received payments directly from a
Borrower (for example, in the case of a delinquency), such payments were also supposed to be
deposited into the appropriate Collection Account. There was therefore no obvious reason

consistent with the Subservicing Agreement for Aleritas or the Franchisor to be making transfers into the MRTA with any frequency.

167.    It appears that some of the transfers described in paragraph 147 above did come as transfers from Aleritas into the MRTA (although the majority of transfers apparently were from other Brooke Entities).  If TBS had been informed that payments were regularly coming into the MRTA from Aleritas or the Franchisor, then TBS could have investigated the situation.  Such investigation could have resulted in the termination of Aleritas as Subservicer, if warranted when the facts were considered, and the subsequent handling of all Servicer-related functions entirely by TBS.  That would have avoided any alleged subsequent misconduct of Aleritas for which plaintiffs now seek to hold defendant otherwise liable herein, all of which appears (although plaintiffs provide few specific details) allegedly to have occurred in 2008.

168.    Pursuant to the definitions in the 2006-1 Indenture, each of the Noteholder and TBS is a Secured Party under the Indenture.  BNYM as Collateral Trustee is a third-party beneficiary of the MASA "for the benefit of the 'Secured Parties' as defined in the Indenture," and hence both TBS and the Noteholder are intended third-party beneficiaries of the MASA. The rights of the Secured Parties can only be vindicated by their direct assertion of these claims, since BNYM holds both trusteeships.  Each of TBS and the Noteholder is entitled to recover all damages occasioned by the aforementioned breaches of contract, negligence, gross negligence, and willful misconduct of BNYM, as well as to demand the accounting sought below.

169.    In order for the Noteholder and TBS to know the extent to which this conduct and willful misconduct by BNYM affected the 2006-1 Securitization, and what BNYM would have known, as Trustee, about the financial condition of the 2006-1 Securitization and the condition of individual 2006-1 Securitization borrowers, it is necessary that BNYM provide an

accounting for the MRTA and for the Sales Commissions for 2006-1 Borrowers that were to be set aside pursuant to MASA § 3.2(b) and then transferred to the Collection Account, as well as an accounting of any other transfers BNYM received from Brooke Entities for the Borrower-Franchisees in the 2006-1 Securitization and how these were applied.

The Final Straws

170.    BNYM's gross failure to perform its duties was capped by what happened in August and September 2008.

171.    When BNYM commenced the BNYM Kansas Action in September 2008, BNYM had to acknowledge that in August 2008 Brooke Entities had successfully misappropriated "monies *deposited into* the Master Receipts Trust Account from which the monies were *supposed to be* sent to Collection Accounts and then distributed under the waterfall" (BNYM Kansas Action Complaint ¶ 2, emphases added).

172.    Once funds were actually *deposited into* the MRTA, these funds were supposed to be under the exclusive control of BNYM, and all monies "supposed to be sent to Collection Accounts" were *supposed to be* identified as such *by BNYM*, segregated as such *by BNYM* and transferred *by BNYM* to the proper Collection Account (MASA §§ 3.3(b) and 3.5).

173.    Given the contractually specified procedures for BNYM's control over the MRTA (including the accountings and transfers), it should have been impossible for BASC or any other Brooke Entities to make withdrawals from the MRTA without approval of the transaction by BNYM and without BNYM having concluded, based on proper accounting, that the transfer was (x) part of BASC's properly calculated percentage of gross sales commissions (MASA § 3.3(a)) or (y) from funds in excess of the amount of the loan payments required to be segregated pursuant to MASA § 3.3(b) (and hence not funds required to be transferred to specific

Collection Accounts) or (z) a return of funds belonging to other Brooke agencies that were not Borrowers with Loans pledged in the securitizations (MASA § 3.7).

174.    Nonetheless, in mid-August 2008 the Brooke Entities had been able to withdraw funds and draw the MRTA down to a net-zero balance, all apparently without BNYM noticing anything amiss, and without BNYM exercising any of the control that was its contractual responsibility.

175.    BNYM reported, in hindsight, that the total amount wrongly removed from the account that BNYM was supposed to control and account for was $11,535,053.98 (BNYM Kansas Action Complaint ¶ 59(C)).  There was only one way misappropriation of such a large amount from the MRTA could occur:  BNYM, having totally abandoned its contractual obligations, had no idea what amounts were properly payable under MASA § 3.3(a), (b), (c), or (d), and had just been allowing BASC or other Brooke Entities to do as they wished.

176.    The flagrant extent to which BNYM had totally abandoned oversight and control over the MRTA was then demonstrated again when, commencing on or about August 20, 2008, the Franchisor caused all insurance premiums and commissions to be diverted from the CRTA (from which they were required to be swept on a daily basis into the MRTA) into an account at a different bank that was owned by the Orr family, so that no money was flowing into the MRTA.  BNYM still failed to catch on.

177.    While conducting its own investigations at Franchisor's office after terminating Aleritas as Subservicer on August 29, 2008, TBS found clues that suggested that massive diversions of Sales Commissions were occurring.  (Prior to that time, TBS had not been provided with CRTA or MRTA bank statements, and had no knowledge of the daily transactions occurring in those accounts.)  As part of its subsequent investigatory work TBS noted that while

over $2,700,000 had been received in the MRTA between August 1 and August 5, 2008, *no deposits* had been received in the same five-day period in September. TBS immediately notified both BNYM and counsel for the investors in all securitized pools serviced by TBS of this situation. At this point, BNYM commenced the BNYM Kansas Action.

178.    When BNYM finally did take control of the MRTA and the process of receiving funds into, and transferring funds from, the MRTA, BNYM had to acknowledge that it did not know how to credit or apply the balances (infra, Answer ¶ 204), and that BNYM needed to hire a consultant to figure all this out.

Additional Allegations With Respect to Plaintiff UniCredit

(a) Pre-Closing Knowledge of BFFC and UniCredit
     And the Risks Inherent in the Note Investment

179.    BFFC and plaintiff UniCredit were aware of the structure of the Brooke Securitizations prior to BFFC entering into the 2006-1 Securitization at issue here. BFFC had purchased $30,000,000 (approximately 60%) of the Notes issued in the December 2005 securitization ("2005-2 Securitization"). From this prior experience and review of the proposed structure of the 2006-1 Securitization, BFFC and UniCredit understood the structure of the 2006-1 Securitization, including the roles of Aleritas and the Franchisor.

180.    BFFC and plaintiff UniCredit therefore knew: (i) how the Loans related to the repayment of the Note; (ii) that many of the Borrowers were persons with limited experience in the insurance business, limited personal assets and even more limited liquidity, and that their future success as franchisees was necessarily uncertain; (iii) that the primary collateral for the Loans was whatever sales commissions these Borrowers might generate while attempting to operate as insurance agents; (iv) that for most such Borrowers' Loans the value of any collateral other than the flow of sales commissions was speculative at best, and the value of any personal

54

guarantees was also speculative since the assets of such guarantors were ill-liquid at best; and (v) that most Borrower-Franchisees were entirely dependent on the Franchisor for the office services necessary to run their agencies and on the Master Agent for much of their ability to arrange insurance for customers.

181. BFFC and plaintiff UniCredit also necessarily understood that under the securitization documents (i) the internal ratings assigned to Borrowers, and/or (ii) deterioration in the business of the Borrowers, and even (iii) defaults by one or more Borrowers on their Loans, did not give the Noteholder or BNYM any right to take actions under the Indenture so long as the amounts currently due on the Note were being paid, from whatever source.

182. Prior to entering into the 2006-1 Securitization, BFFC and plaintiff UniCredit had the opportunity to conduct whatever due diligence, including credit evaluation, they wished to conduct with respect to the specific Loans and Borrowers.

183. Defendant states, on information and belief, that BFFC or plaintiff UniCredit must have made some pre-investment review of the specific Borrowers and Loans because BFFC sought a rating from Standard & Poor's ("S&P") for the Note, in a pre-closing financial review with which TBS had no involvement; such process should have involved a review of each of the elements of the collateral.

184. BFFC represented in its Subscription Agreement that it "understands the risks of . . . ownership of the Note." BFFC understood that evaluation of the "risks" included evaluation of the risks associated with the Loans, since, although the securitization structure provided a "cushion" by requiring (in effect) the Issuer to absorb the impact of the first approximately 20% of principal loss on the Loans, if there were substantial defaults by these individual Borrowers, the Noteholder could suffer a loss on the principal of the Note.

185.   BFFC and plaintiff Unicredit also necessarily understood that if the Franchisor and Master Agent went out of business for any reason while the Notes were still unpaid, the result could be a collapse of individual Borrowers' businesses (because these were operationally dependent on the Franchisor and Master Agent), even if those businesses had been operating successfully to that point, with whatever consequences might then follow for the Notes.  Assessing the risks that the financial health of the Franchisor might pose for the Noteholder's investment in the Note was Noteholder's responsibility.  These too were among the "the risks of . . . ownership of the Note."

(b) Knowledge of the Condition of the Borrowers
    as the 2006-1 Securitization Proceeded

186.   Having negotiated for the inclusion of the "DTR Trigger" in the 2006-1 Securitization structure (a feature which was not part of the 2005-2 Securitization structure in which BFFC had purchased a majority of the Notes) and having negotiated the definition of the Debt-to-Revenue Ratio ("DTR Ratio") to be reported each month and the thresholds that would give rise to a DTR Trigger, BFFC and plaintiff UniCredit would certainly have been attentive to the "DTR Schedule" that accompanied the monthly Certificate.

187.   BFFC and plaintiff UniCredit were therefore aware that the reported "annualized," weighted revenue figure for the 2006-1 Securitization Borrowers as a group steadily declined with each passing month after August 2006 ($34,378,514), including:

| | |
|---|---|
| 12/06 | $31,657,244 |
| 3/07 | $28,858,843 |
| 6/07 | $27,903,050 |
| 9/07 | $24,943,527 |
| 12/07 | $23,801,362 |
| 3/08 | $22,449,686 |

188.    Rather than "annualized" revenues increasing, as might have been expected if the Borrower-Franchisees were successful, the calculated revenues declined by over 30% between August 2006 and December 2007, declining at a significantly faster pace than the Loan principal balance was being reduced (21% over the same period). In fact, the first "DTR Trigger" was reported as of November 2007.

189.    Moreover, although only one 2006-1 Securitization Borrower had been an internal rating of "fail" as of June 2007, an additional ten had been rated "watch" by then, indicating that, within a year after the closing, a number of Borrowers were already receiving some level of Loss Mitigation Assistance. The Borrower-Franchisees among the eleven (some were Allstate agents) represented over 33% of the principal amount of the Borrower-Franchisee Loans in the 2006-1 Asset Pool.

190.    Whatever the "internal ratings" might have told UniCredit about particular Borrowers (see the allegations at Complaint ¶¶ 58-61), UniCredit could not avoid knowing that collectively the Asset Pool Borrowers were not entirely successful, and that some were suffering declining commission revenues – with such commissions being the primary collateral for, and primary source of payment for, the Note.

191.    Nothing in the 2006-1 SSA provides for the Servicer to report or disclose in its monthly Certificate and related report the "level" of Loss Mitigation Assistance a particular borrower is receiving (these levels are described in Schedule C-1 to the 2006-1 SSA), and throughout the term of the 2006-1 Securitization that had not been the practice, even as Loans were identified as being in categories where such services were called for pursuant to Schedule C-1. Nonetheless, if – as plaintiffs now profess – they were interested in such information, they could have inquired about this in June 2007 or even earlier (and they did not, until much later).

192.    Plaintiffs contend that there were steps they "could have undertaken" to mitigate their alleged eventual loses had they known that Loans were "nonperforming" as of January 2008 (Complaint ¶¶ 60-61 and 87).  Well before that date plaintiffs had ample notice that a significant volume of the Loans were the subject of Loss Mitigation Assistance, and plaintiffs (i) should then have made appropriate inquiries and (ii) should then have taken whatever actions they now in hindsight allege were possible.

193.    Although plaintiffs plead that they were unaware until June 2008 of the "nonperforming" status of various Loans as reflected by the level of "loan mitigation services" being received, in fact, in April 2008 an officer of UniCredit went to the Aleritas offices in Kansas and personally inspected files and electronic information concerning specific borrowers in the 2005-2 and 2006-1 Securitizations.  That UniCredit officer also questioned Aleritas employees about the "collateral preservation" fees being incurred for these borrowers based on loan mitigation services.

(c)  Knowledge About the Brooke Entities

194.    On information and belief, because of the size of BFFC's investments in the 2005-2 Notes and the 2006-1 Note, plaintiff UniCredit actively monitored the Brooke Entities' business, made direct contact with management at the Brooke Entities, and discussed these Notes and the Brooke Entities with S&P (because of UniCredit's desire to have a continuing S&P rating on these Notes that was acceptable for its own business purposes).  The details of such contacts and what plaintiff UniCredit knew as a consequence are not now known to defendant and will have to be obtained in discovery.

195.    In a Form 10-Q for the period ending September 30, 2007 (filed November 7, 2007), Brooke discussed at some length the "extra monitoring and consulting with

borrowers provided . . . pursuant to collateral preservation agreements with lenders." Brooke referred to the "significant expenses [incurred] performing CPA activities . . . to assist lenders," and reported CPA expenses of $15,766,000 for the nine months ending September 30, 2007. Brooke stated its intention to reduce such expenses and "cancel CPA agreements . . . on those conversion loans for which rehabilitation is too expensive." Brooke warned that: "The cost reduction measure by Brooke Capital may result in more lender losses as there will be less emphasis on rehabilitating poorly performing franchisees and more emphasis on moving poorly performing franchises out of the franchise system."

196.   On information and belief, personnel at UniCredit were aware of the content of this Brooke 10-Q shortly after it was filed. Although the 10-Q did not single out borrowers in any particular Brooke securitization or other credit facility, UniCredit was aware of the implication that there were numerous "poorly performing franchisees" in the various securitizations, potentially including the two securitizations in which it was a Noteholder, and that Brooke had expressly warned of "more lender losses" with respect to such Borrowers.

197.   On information and belief, S&P contacted various Noteholders about the disclosures Brooke Capital had made concerning its "CPA activities" and its prediction of "more lender losses." Defendant does not know at this time the extent to which S&P had such communications with plaintiff UniCredit, and this information will have to be obtained in discovery.

198.   On information and belief, by some time no later than early 2008 plaintiff UniCredit was well aware that (i) some Brooke Entities were spending large amounts of money on CPA services; (ii) some Brooke franchisees were failing, and "more lender losses" were to be expected; (iii) a significant number of 2006-1 Borrower-Franchisees were receiving CPA

services; (iv) Brooke had taken over the operation of a significant number of franchises, including some franchises in the 2006-1 Securitization, because those franchises were failing; and (v) Brooke Entities were facing cash flow difficulties.  Indeed, as pleaded above, an officer of UniCredit went to Aleritas to investigate such issues in April 2008.

199.    Similarly, plaintiff BNYM cannot plausibly claim that it was not aware of problems at the Brooke Entities prior to seeing the Servicer's June 2008 Certificate (compare Complaint ¶¶ 60-61).  BNYM was in contact with Noteholders in other securitizations that were well aware of what Brooke had said about reducing its CPA services and the prospect of "more lender losses," and during the early months of 2008 BNYM was aware that Brooke Entities were attempting to change the "models" for their business because of the cash flow concerns Brooke Entities faced as existing franchisees' businesses slowed and the pace of adding new franchises slacked.

200.    Discovery will be required to establish how closely BNYM was monitoring the Brooke Entities' businesses at the various times in 2008.  But it appears to be the case that BNYM also knew early in that period (i) that S&P was considering downgrading its ratings on some of the securitization notes; (ii) that Brooke Entities were taking over and/or closing an increasing number of franchises; and (iii) that Brooke Entities were looking to "restructure" their businesses and were negotiating with a "restructuring firm" about engaging that firm for such purposes.

201.    Discovery will establish what else BNYM and UniCredit knew, and when.

202.    Plaintiffs were not dissuaded from taking any action that either might have later deemed prudent by reason of the fact that certain information did not appear in the Servicer Certificate until June 2008.  If plaintiffs had the right, in the absence of a default as to payment

on the Notes, to take any of the actions referred to in Complaint ¶ 87, then they had ample reason to take such actions and to have "averted or substantially reduce the losses they have suffered" months before June 2008.

Conduct by BNYM and UniCredit
in September-October 2008

(a) Cutting Off Franchisee Support and Cash Flow

203. As pleaded above, starting on or about August 20, 2008, the Franchisor and/or Mr. Robert Orr personally began to divert a large volume of Sales Commissions from the CRTA/MRTA pipeline into other Brooke accounts at a bank owned by the Orr family. This was possible only because of the gross negligence of BNYM. The result was not merely that funds that should have been applied to Loan payments were diverted, but also that "net" funds which should have flowed through to the individual Borrower-Franchisees were lost to those agencies, leaving them strapped for cash.

204. During September and October 2008, BNYM refused to release funds that were available in the MRTA on the ground that BNYM did not know, on its own, how to allocate those funds between Securitizations or, within any securitization, to the credit of specific Borrower-Franchisees. BNYM was in this position primarily because it had never performed these allocations itself in the past, even though this was its contractual responsibility under the MASA.

205. On information and belief, BNYM's actions in this regard were taken with the approval of UniCredit, if not at its actual direction (a question defendant cannot answer without discovery).

206. Because BNYM did not release funds, Borrower-Franchisees for which BNYM had received sufficient Sales Commissions to cover their Loan payments and then have a

surplus to which those agencies were absolutely entitled (MASA § 3.3(d)) did not receive their own earnings back from BNYM. Hence those agencies faced a liquidity crisis under which they were simultaneously (i) losing the assistance of the Franchisor in providing back-office services and (ii) being wrongfully denied the cash flow that might allow them to pay for such services on their own and (iii) being denied any profit or other compensation for their work. Inevitably, 2006-1 Borrower-Franchisees that had previously been meeting their Loan obligations began to go out of business, and the flow of Sales Commissions that would otherwise have been available to pay their Loan obligations (and hence to cover payments on the 2006-1 Note) declined precipitously.

207.   On information and belief, a substantial majority of 2006-1 Borrowers (both Borrower-Franchisees and Allstate Loan Borrowers) had been operating their businesses with enough success prior to September 2008 that they had been able to meet their Loan payment obligations with their own revenues. The actions taken by BNYM, either at the direction of UniCredit or with its consent, compromised the future viability of those businesses, and effectively destroyed many of them.

208.   During this same period, on information and belief, the Special Master asked UniCredit to provide some form of additional financing, forbearance, or other financial assistance to allow the Special Master to continue the back office operations, so that those Borrowers whose businesses appeared to have reasonable prospects of surviving could continue to operate. On information and belief, UniCredit refused to provide any form of financial assistance or to allow release of funds flowing to accounts in the control of the Special Master or BNYM, thus effectively sealing the fate of those businesses and in the process insuring that Sales

Commissions that might otherwise have flowed from such Borrowers and thereby supported payments on their Loans (and, thereupon, payments on the Note) would dry up (as they did).

(b) UniCredit's Taking Independent
    Responsibility for the Loans and
    "Realization" of Collateral

209.    Commencing in September 2008 UniCredit attempted to take control of all dealings with Borrowers and all collections on the Loans in the 2006-1 Securitization, even though UniCredit had no such authority prior to the apparent December 2008 foreclosure of the security interests granted in the Indenture.  (Indeed, even the foreclosure did not confer on UniCredit (as opposed to BNYM) any right to deal directly with the Borrowers, but it appears that by the time of the foreclosure notice BNYM had given UniCredit some form of power of attorney to act on its behalf, the scope of which is not now known to defendant.)

210.    Commencing in September 2008, UniCredit also interfered with TBS's servicing of various loans in the manner required of TBS by the 2006-1 SSA.  UniCredit did so by, *inter alia*, directing Borrowers not to provide information to TBS, negotiating directly with Borrowers to change the terms of loans without informing TBS of the changes, receiving payments through methods and accounts not permitted under the securitization documents, exercising control over funds of Borrowers in a manner not authorized under the documents, and sending default notices and undertaking other collection efforts against Borrowers and third parties that may result or have resulted in ambiguous and possibly conflicting demands or instructions to such Borrowers and third parties, all such actions thereby causing delay, increasing expenses of collection, potentially providing defenses to Borrowers or third parties, and substantially decreasing amounts that might ultimately be collected on Loans.

Status of the Note

211.    On or about October 24, 2008, BNYM declared that an Event of Default had occurred and that, at the direction of the Noteholder and pursuant to Indenture § 5.2, the Note was immediately due and payable in full.  On October 28, 2008, the Special Master caused the Franchisor and certain other Brooke Entities (but not SPE-6 or Aleritas) to file for protection under Chapter 11 of the Bankruptcy Code.

212.    On or about December 18, 2008, plaintiff UniCredit, acting in the place of BNYM pursuant to a power granted to it by BNYM as Indenture Trustee, delivered to SPE-6 the U.C.C. § 9-620 notice attached as Exhibit A to this Answer.  It would appear that "strict foreclosure" of the Trustee's interest in the Collateral thereafter occurred as a matter of law, upon the passage of sufficient time without proper objection from SPE-6.

213.    If, as appears, the BNYM "strict foreclosure" occurred, then, pursuant to N.Y.U.C.C. § 9-620, the Note obligation has been satisfied by operation of law, BNYM as Indenture Trustee is now the owner of the Loans, and the obligation on the Note has been satisfied and extinguished.

## FIRST SET OF AFFIRMATIVE DEFENSES
### (As to Standing to Sue and/or Failure to State a Claim on Which Relief Can Be Granted for the Alleged Injuries)

214.    In the absence of evidence that BFFC, the purchaser of the 2006-1 Note, validly transferred said Note to plaintiff UniCredit, such plaintiff lacks standing to sue with respect to the Note.

215.    The Note having been satisfied by operation of plaintiffs' use of the N.Y.U.C.C. § 9-620 procedure, the Noteholder has no standing to sue for alleged damages or losses on the Note (in the alternative, any claim purportedly based on the existence of an actual

or potential deficiency or any other form of loss on the Note fails to state a claim on which relief can be granted, because the Note is satisfied as a matter of law).

216.   To the extent plaintiff BNYM is suing for alleged diminution of the value of Collateral while that Collateral was pledged to it under the Indenture, BNYM did not suffer any legally cognizable injury in that regard prior to the time it conducted its strict foreclosure on the Collateral.

217.   Pursuant to N.Y.U.C.C. § 9-620, BNYM, as Indenture Trustee, is now the owner of the Loans.   The strict foreclosure elected by BNYM extinguishes any claim with respect to the prior security interests, and plaintiff BNYM as Collateral Trustee either lacks standing to sue on claims relating to alleged prior injuries to such security interests or fails to state a claim with respect thereto.

218.   Because plaintiffs do not allege that defendant committed any wrongful acts or injured them in any way in the period after BNYM became owner of the Loans by strict foreclosure in December 2008, plaintiff BNYM fails to state a claim upon which relief may be granted with respect to any losses on the Loans.

219.   Plaintiff BNYM appears to be suing on the premise that it may now, as Indenture Trustee (and owner of the Loans in that capacity), recover less on some Loans than might have happened absent the alleged fault of defendant. 2006-1 SSA § 7.1(e) expressly precludes the Trustee from bringing a claim for "recourse for uncollectible or uncollected Loans," and hence BNYM either lacks standing to sue for such purported damages herein or has failed to state a claim upon which relief can be granted in that regard.   The Noteholder has no direct legal interest in the Loans, but, if the Noteholder did, then its interest would necessarily be derivative of the Trustee's interest, and would remain subject to that contractual preclusion.

## SECOND SET OF AFFIRMATIVE DEFENSES
### (BNYM as Successor to the Issuer)

220.     Insofar as BNYM now sues as owner of the Loans which it apparently acquired from the Issuer in December 2008, any claim by BNYM is subject to all factual, legal, and equitable defenses that could have been asserted against the Issuer.

221.     The Issuer, as successor to Aleritas as owner of the Loans, was also dominated and controlled by Brooke Entities. Its President was Michael Lowry, who was also the President of Aleritas and actively controlled its business dealings.  Mr. Lowry was the person who was directly responsible for, and who "certified," the Credit Review spreadsheet that contained the borrower-specific internal ratings that plaintiffs complain were inaccurate (Complaint ¶ 58-61).  To the extent that Aleritas may have been engaged in any misconduct or may have provided any false or misleading information that was then used in the Servicer's monthly report or Certificate (including without limitation the internal ratings), the Issuer was not misled in any regard because it had actual knowledge of the true facts through Mr. Lowry. Moreover, because of such shared knowledge the Issuer was complicit in any such misconduct.

222.     At the time BNYM apparently acquired the Loans from the Issuer pursuant to N.Y.U.C.C. § 9-620, BNYM was aware of the prior misconduct of the Brooke Entities, of the then-current financial condition and creditworthiness of the Borrowers on the Loans, of the minimal value of any Borrower collateral for such Loans (other than any remaining Sales Commissions), and of any extent to which the "financial condition" of such Borrowers allegedly had been misrepresented in the past.  In its capacity as the current holder of the Loans, BNYM has no legally sufficient claim for any supposed negligence or breaches of contract by the Servicer or by Aleritas as Subservicer as alleged in the Complaint.

## THIRD SET OF AFFIRMATIVE DEFENSES
### (Specially as to Negligence Claim)

223.    The 2006-1 SSA provides in § 7.1 in pertinent part: "The Servicer shall be liable hereunder only to the extent of the obligations in this Agreement specifically undertaken by the Servicer. . ." Defendant's liability, herein, if any, is a matter of contract, and plaintiffs' Second Claim, sounding in negligence, fails to state a claim upon which relief can be granted.

224.    In the alternative, if plaintiffs are permitted to proceed on a claim based on tort, then pursuant to CPLR Article 14A, each plaintiff's recovery is to be reduced to the extent of its own "culpable conduct" as found at trial, including that conduct alleged above.  For these purposes the conduct of BNYM is attributed to plaintiff UniCredit since BNYM acted as agent for the Noteholder.

225.    2006-1 SSA § 7.1(e) provides "Notwithstanding anything contained in this Agreement, the Servicer shall not be liable for any special, incidental or consequential damages arising in connection with the performance of its duties hereunder."

226.    Plaintiffs have not alleged any "direct," non-consequential, damages for which they may recover based on any conduct of the defendant.

227.    Any direct ("out of pocket") damages on any tort claim must be reduced by any incidental profits achieved by plaintiffs in connection with the transaction, including interest collected, fees collected (including the $550,000 "Arrangement Fee" collected by BFFC), and any other items of profit, as well as by any "subsidy" Note payments the Noteholder received by reason of purported delays in taking action.

## FOURTH SET OF AFFIRMATIVE DEFENSES
### (Contractual Provisions)

228.     The 2006-1 SSA provides in § 7.1 in pertinent part: "The Servicer shall be liable hereunder only to the extent of the obligations in this Agreement specifically undertaken by the Servicer. . ." To the extent that either plaintiff is attempting to seek recovery herein on any other basis (see, e.g., Complaint ¶ 12 (TBS asserted to be "directly responsible for Aleritas' breaches of the Subservicing Agreement. . .")), plaintiffs are contractually barred from asserting such claims and have no standing to assert such claims; alternatively, plaintiffs have failed to state a claim in that regard upon which relief can be granted.

229.     Plaintiffs sue as third party beneficiaries of the 2006-1 SSA and, as such, their claims are limited by the contractual terms thereof, including without limitation, the provisions of 2006-1 SSA §§ 7.1(a) and (e), § 7.3 and § 3.2(d).

## FIFTH SET OF AFFIRMATIVE DEFENSES
### (Mitigation of Damages; Consequential Damages)

230.     With respect to any claim premised on the 2006-1 SSA or the other 2006-1 Securitization documents, plaintiffs have failed to mitigate damages.

231.     With respect to any claim based on the Loans, plaintiffs have failed to mitigate damages.

232.     Pursuant to § 7.1(e), "the Servicer shall not be liable for any special, incidental or consequential damages arising in connection with the performance of its duties hereunder."

## SIXTH SET OF AFFIRMATIVE DEFENSES
### (Nature of Alleged Injury and Causation)

233.    The damages for which plaintiffs seek recovery have not been imposed on

them and do not arise from any material breach of the 2006-1 SSA and were not proximately

caused by any conduct properly attributable to defendant.

234.    The damages claimed by plaintiffs are attributable to the Noteholder's

own credit decision in buying the Note based on the collateral available in the 2006-1

Securitization coupled with the contractual restraints which the Noteholder and BNYM

knowingly accepted as part of the transaction, as well as (a) the business circumstances of such

Borrower-Franchisees as these existed at the time the Noteholder bought the Note and as these

evolved over time, (b) the fact that the portion of some such businesses' net commission

revenues absorbed by Franchisor fees and required payments on the Loans left some businesses

with insufficient net revenues to sustain operations, (c) an unknown amount by which the

diversion of funds by the Franchisor or others (including diversions possible only because of the

gross negligence of BNYM) affected the 2006-1 Securitization, (d) decisions by BNYM and

UniCredit in September-October 2008 that prevented funds from flowing out of the MRTA to

pay for back office and other support needed by the franchisees and otherwise deprived the

franchisees of essential cash flow, and, eventually, (e) the result of losing the back office services

provided by the Franchisor and the ability to write insurance (and generate Sales Commissions)

through BASC, as a result of events following the appointment of the Special Master (including

the conduct of BNYM and UniCredit).   In addition, some or all of the damages suffered by the

Noteholder were proximately caused by BNYM's gross negligence and misconduct as Master

Agent Trustee.   Some or all of the damages suffered by the plaintiffs also may have been

proximately caused by the misconduct of the Brooke Entities and their management.

235.   BNYM having acquired the Loans in December 2008 and plaintiff UniCredit having taken all responsibility for dealing with the Borrowers in September 2008, any loss suffered in connection with the Collateral, including the Loans, subsequent to such dates was not proximately caused by, or otherwise attributable to, the Servicer.

### SEVENTH SET OF AFFIRMATIVE DEFENSES
### (2006-1 Noteholder Benefitted, Not Injured,
### By Continuing Operation of Brooke and
### Borrowers in First Half of 2008)

236.   Plaintiffs allege that they would have taken certain actions earlier if certain information allegedly not revealed to them until June 2008 had been revealed earlier that year or even in 2007 (e.g., Complaint ¶¶ 60-61, 87).  If it were true, as plaintiffs appear to allege, that some conduct by defendant caused the 2006-1 Securitization to continue during later 2007 and the first half of 2008 without the declaration of an Event of Default under the Note, plaintiffs were benefitted rather than injured as a result of this delay.

237.   The continuation of the 2006-1 Securitization during this period resulted in the continuing operation of the Franchisor and the Master Agent (both of which would, in practice, have ceased operations upon a declaration of Default under any of the securitizations or upon any action by BNYM as Indenture Trustee to foreclose on the Collateral).  This meant that Borrowers whose business operations depended on support services furnished by the Franchisor (including bookkeeping, collections, and advertising), and on the Master Agent (for the ability to write insurance policies with particular insurance companies, the right to receive premiums from insurance companies, and the collection of commissions) were able to remain in business, generating new Sales Commissions that were applied, among other things, to payments of (i) various BNYM fees and (ii) amounts due as interest or principal on the Note.  These are payments that the Trustee and Noteholder would not have collected if actions had been taken

earlier (as plaintiffs now allege should have happened, Complaint ¶ 87) that would have disrupted the continued operations of the Franchisor and Master Agent and therefore disrupted the business of the Borrower-Franchisees.

238.   It appears that throughout the period covered by the 2006-1 Securitization until approximately June 2008 various Brooke Entities were making unsecured loans or advances to some of the Borrowers whose Loans were part of the 2006-1 Asset Pool in order to assist those agencies in continuing in business, by advancing funds to those Borrowers to cover their operating expenses, and by otherwise advancing working capital.  As a consequence of such assistance, such agencies did continue in business longer than might otherwise have been the case, thereby generating Sales Commissions that were collected and applied to payments on the 2006-1 Note.  The result was that BNYM continued to receive Sales Commissions from 2006-1 Securitization Borrowers in the MRTA, and the Noteholder continued to collect payments on the Note, above and beyond what would have been received in the absence of these unsecured subsidies to such Borrowers.

239.   Such additional extensions of credit would surely have ceased at once if an Event of Default had been declared in any securitization, or if these plaintiffs had taken actions to muster, marshal, or foreclose on the Collateral or otherwise had earlier taken the actions plaintiffs allege in the Complaint they "could have" taken.

240.   Hence in this regard plaintiffs were benefited, rather than injured, by any supposed delay in their taking such actions, whatever the purported cause of such delay.

241.   As pleaded at Paragraph 147 above, commencing at some time in summer 2007 various Brooke Entities also began to make advances (unsecured loans) to Borrowers by making transfers directly to the MRTA in partial payment of Loan obligations of such

Borrowers.  As a consequence, from this point forward the Noteholders in the various securitizations may actually have received millions of dollars in payments on their Notes that may have been funds in excess of the net proceeds of the Sales Commissions pledged to them, to their substantial net benefit.

242.    To what extent the 2006-1 Noteholder in particular benefitted from these advances and any resulting additional Note payments, defendant is unable to state absent an accounting from BNYM.  In the course of allocating funds from the MRTA to the Collection Account for the 2006-1 Securitization, BNYM should have known, and BNYM was charged with keeping an account that would establish, the extent to which funds coming into such Collection Account came from Brooke Entities' transfers to the MRTA rather than from available net Sales Commissions.  These amounts can be established by ordering BNYM as the Master Agent Trustee to provide an accounting, as requested below.

243.    Without doubt, these advances by Brooke Entities on behalf of an unknown number of borrowers in the various securitizations would have ceased if an Event of Default had been declared in any securitization, or if these plaintiffs had taken actions to muster, marshal, or foreclose on the Collateral or otherwise had earlier taken the actions plaintiffs allege in the Complaint they "could have" taken.

244.    Hence, in this regard as well plaintiffs were benefited, rather than injured, by any supposed conduct that allowed the 2006-1 Securitization to continue to operate through June 2008, whatever the purported cause of such delay.

## EIGHTH SET OF AFFIRMATIVE DEFENSES
### (Statute of Limitations)

245.   Because of the vagueness and lack of specificity in the Complaint about what allegedly was done wrong by defendant when, and how that may have affected one or the other of plaintiffs, defendant is unable to ascertain from the Complaint when most of the alleged wrongs occurred.

246.   To the extent plaintiffs' claims are based on any legal theory other than breach of contract, those claims are barred, in whole or in part, by the applicable statute of limitations.

## FIRST COUNTERCLAIM
### (For an Accounting by BNYM)

247.   Defendant incorporates by reference its pleadings in Paragraphs 101-213 above.

248.   Defendant is a third-party beneficiary of the MASA.

249.   BNYM failed to perform the Commissions Accounting required as part of its contractual duties and which is necessary herein in order to compute the actual amount of any alleged losses of plaintiffs with respect to any specific Loans in light of the Loan subsidies described above.

250.   In addition, recognizing that a single MRTA to be controlled by BNYM was used for all the Brooke securitizations, an accounting is necessary to determine the extent to which funds that were, or should have been, in the MRTA but were successfully diverted by Brooke Entities as a result of BNYM's failures to control the account (see Answer ¶¶ 171-77 above) are funds that should have been received by the 2006-1 Collection Account (as opposed to being funds belonging to other securitizations).

251.    Defendant asks the Court to order BNYM to provide an accounting in sufficiently specific form to show, on a monthly basis, for each Borrower-Franchisee in the 2006-1 Securitization, the (i) gross Sales Commissions for the month received into the MRTA; (ii) the net Sales Commissions required to be set aside for such Borrower-Franchisee by MASA § 3.3(b) after the subtraction of the Master Agent sum under MASA § 3.3(a); (iii) any amounts paid out to or for said Borrower-Franchisee pursuant to MASA § 3.3(c) or (d); (iv) the amount of Sales Commissions transferred from the MRTA to the 2006-1 Collection Account as Loan payments on behalf of said Borrower-Franchisee; (v) any other amounts transferred from the MRTA to the 2006-1 Collection Account with respect to such Borrower-Franchisee, and the source thereof.  The Accounting should also show, separately for each month, (i) each transfer of funds other than Sales Commissions or funds from the CRTA that was received in the MRTA (with the source of such transfer), (ii) how any such funds were or should have been allocated or credited to any 2006-1 Borrower-Franchisees and (iii) the amount, if any, of each such transfer that was thereafter transferred to the 2006-1 Collection Account as well as (iv) each amount received directly into the 2006-1 Collection Account on account of any Borrower-Franchisee (i.e., any amounts directly deposited into the 2006-1 Collection Account without first passing through the MRTA), (v) to which such Borrower-Franchisee such amount related, and (vi) the source of such amount.  Finally, for any period in which funds other than Sales Commissions or funds from the CRTA were received into the MRTA, the Accounting should show (i) each transfer out of the MRTA other than to Collection Accounts or in payment of the amounts specified in MASA §§ 3.4(a) and (b), together with a statement of to whom such transfer was made and how the transferred funds were, or should have been, allocated to specific Borrower-Franchisees or other persons,

## SECOND COUNTERCLAIM
### (Against BNYM for Unpaid Servicer Fees)

252.    Defendant incorporates by reference its pleadings in Paragraphs 101-213 above.

253.    As pleaded in Complaint ¶ 83, "TBS remains the Servicer of the 2006-1 Securitization." Neither plaintiff has terminated TBS as the Servicer under the 2006-1 SSA; TBS has continued to perform the functions of Servicer (to the extent permitted given the interference of plaintiff UniCredit as alleged above); and TBS is entitled to the fees set forth is the 2006-1 SSA.

254.    Pursuant to 2006-1 SSA §§ 3.8 and 4.6, TBS is entitled to receive a monthly Servicing Fee as defined in that agreement, and that fee is to be paid by BNYM as Trustee from the 2006-1 Collection Account. (In section 6.1(k) of the Indenture, the Trustee agreed to "perform all the obligations and duties required of it under the Sale and Servicing Agreement," and TBS as Servicer and Secured Party is a third-party beneficiary of that undertaking.)

255.    Commencing in September 2008, defendant BNYM refused to pay to TBS its Servicing Fee, notwithstanding the receipt of instructions pursuant to 2006-1 SSA § 4.6 for such payment. BNYM has not provided a sufficient legal justification for refusing to pay out these amounts.

256.    On May 28, 2009, BNYM advised TBS that its Servicing Fees were being "escrowed" and that this was based on "noteholder direction." BNYM declined to provide any legal basis for the "escrow" action beyond its receipt of such "direction," and the Noteholder has not provided any sufficient legal justification for giving such direction.

75

257.   Pursuant to 2006-1 SSA § 7.2, TBS had covenanted not to resign as Servicer except under very limited circumstances.  However, if TBS had breached its contractual obligations as Servicer then either BNYM or Noteholder could declare a Servicer Termination Event (id., §§ 8.1(C) or (E)).

258.   If BNYM (or Noteholder) had a good faith belief that TBS was in breach of the 2006-1 SSA (which TBS would dispute), BNYM (or the Noteholder) could declare a Servicer Termination Event.  Instead, UniCredit willfully and wrongly instructed BNYM, with BNYM wrongfully taking that direction, not to pay TBS its Servicing Fees even while requiring TBS to continue to perform the Servicer functions (because TBS could not resign and plaintiffs declined to declare a Servicer Termination Event).

259.   The right of the Servicer to payment of its fees is senior in the distribution "waterfall" of 2006-1 SSA § 4.6 to any right of the Noteholder.  The Trustee's undertaking to perform its obligations under the 2006-1 SSA is not limited or qualified in any way to allow the Trustee to decline to exercise its 2006-1 SSA obligations to pay the Servicer because the Noteholder prefers otherwise.

260.   As of August 25, 2011, the indebtedness owing to TBS for unpaid Servicing Fees was $708,245.08, which amount BNYM apparently holds in the 2006-1 Collection Account and has failed and refused to pay TBS notwithstanding its clear obligation to pay over such amounts pursuant to MASA § 3.5 and 2006-1 SSA § 4.6.

261.   Accordingly, TBS seeks (i) an award of damages and contractual interest against BNYM for the amount of its unpaid Servicing Fees (which amount shall come from the 2006-1 Collection Account to the extent previously set aside and available and otherwise be a charge against BNYM in its personal capacity for its willful misconduct), and (ii) a declaration

of the rights of the parties directing BNYM to resume the monthly payment of the Servicing Fee from the 2006-1 Collection Account so long as TBS remains the Servicer, to the extent funds are available therefor as provided in 2006-1 SSA § 4.6.

### THIRD COUNTERCLAIM
### (Against UniCredit for Breach of the MASA and Indenture)

262.     Defendant incorporates by reference its pleadings in Paragraphs 101-213 above.

263.     MASA § 8.9 provides that "if any Event of Default, Servicer Termination Event or Master Agent Event of Default shall have occurred and be continuing, Master Agent Trustee shall act upon and comply with written notices and instructions given by the Note Voting Amount" and Indenture § 6.2(g) provides that the "Trustee shall act as directed by the Note Voting Amount" (in this case the single Noteholder constituted the entire Note Voting Amount).

264.     As pleaded in Paragraph 260 above, BNYM has failed to pay TBS its Servicing Fees based on instructions given by UniCredit on behalf of the Noteholder.

265.     In giving such instructions, which were without basis under any of the 2006-1 Securitization documents, the Noteholder has breached the MASA and Indenture, and is liable in damages for the amount of all Servicing Fees unpaid at the time of trial.

### FOURTH COUNTERCLAIM
### (Against BNYM for Breach of Contract)

266.     Defendant incorporates by reference its pleadings in Paragraphs 101-213 above.

267.     Defendant is a third-party beneficiary of the MASA and of the Indenture.

268.     BNYM breached the MASA by not performing the Commissions Accounting, by otherwise being inattentive to the operation of the MRTA and by not acting upon

information that BNYM would have known if it had properly performed its contractual duties. Such breach was a willful decision on the part of BNYM not to perform the contractual duties specified in the MASA, duties for which it was compensated as Master Agent Trustee.

269.    By not taking action to remedy this situation of its own making and by not notifying the Servicer and the Noteholder that the Master Agent Trustee was not fulfilling its contractual duties, BNYM also breached its contractual duties as Indenture Trustee.

270.    Because BNYM breached its Master Agent Trustee duties, and was grossly negligent in that regard, BNYM did not notify the Noteholder or Servicer of facts that BNYM should have known in the performance of those duties. The information that would have been readily available to BNYM if it had not willfully abandoned its contractual duties is the sort of information that plaintiff UniCredit now claims would have caused it to "take action" with respect to the Brooke Entities or the Loans earlier than UniCredit otherwise did.

271.    BNYM's breach of its contractual duties made it more difficult for TBS, as Servicer, to evaluate the conduct of Aleritas in its role as Subservicer, and the failure to provide the foregoing information may have allowed Aleritas to continue in that role during later 2007 and thereafter where otherwise it might have been terminated after appropriate investigation. Accordingly, if (as plaintiffs allege) Aleritas failed to provide accurate and timely information in some regard which resulted in the breach of defendant's obligations under the 2006-1 SSA (which defendant denies), such breach was proximately caused by, and was the foreseeable consequence of, the breaches of contract by BNYM, and any damages the Noteholder may have suffered as a consequence (which is a matter in dispute) and for which UniCredit now seeks to hold defendant liable were proximately caused by BNYM.

272.     Such breaches of contract by BNYM have caused damages to defendant in an amount to be determined at trial, including (i) any amounts that it is required to pay plaintiff UniCredit that could have been avoided if BNYM had performed its duties, (ii) the expenses it has incurred in the Bankruptcy Adversary Proceedings in the District of Kansas relating to certain Brooke Entities to the extent such proceedings are the result of BNYM's misconduct as Master Agent Trustee, (iii) any diversions of Sales Commissions or Loan payoff amounts that may have affected the 2006-1 Securitization and that would have been avoided if BNYM had timely revealed the foregoing information, to the extent that the Servicer then became contractually responsible for such amounts.

### FIFTH COUNTERCLAIM
### (Against BNYM for Gross Negligence)

273.     Defendant incorporates by reference its pleadings in Paragraphs 101-213 above.

274.     Defendant is a third-party beneficiary of the MASA and of the Indenture.

275.     The inaction, lack of diligence and actions of BNYM described above constituted gross negligence or misconduct by BNYM both as Master Agent Trustee and as Indenture Trustee.

276.     BNYM's gross negligence and misconduct made it more difficult for TBS, as Servicer, to evaluate the conduct of Aleritas in its role as Subservicer, and the failure to provide the foregoing information may have allowed Aleritas to continue in that role during later 2007 and thereafter where otherwise it might have been terminated after appropriate investigation.  Accordingly, if (as plaintiffs allege) Aleritas failed to provide accurate and timely information in some regard which resulted in the breach of defendant's obligations under the 2006-1 SSA (which defendant denies), such breach was proximately caused by, and was the

79

foreseeable consequence of, the gross negligence and willful misconduct of BNYM, and any damages the Noteholder may have suffered as a consequence (which is a matter in dispute) and for which UniCredit now seeks to hold defendant liable were the direct and foreseeable consequence of BNYM's gross negligence and willful misconduct.

277.    BNYM is liable to defendant for its gross negligence and willful misconduct in an amount to be determined at trial.

## SIXTH COUNTERCLAIM
### (For Contribution by BNYM)

278.    Defendant incorporates by reference its pleadings in Paragraphs 101-213 above.

279.    If plaintiff UniCredit has a claim herein sounding in negligence (as pleaded in Count II of the Complaint) or in any respect based on alleged tortious conduct by defendant, which claim defendant disputes both as a matter of law and on the factual merits, then BNYM is subject to liability for damages for the same injury caused to UniCredit, and defendant is entitled to contribution from BNYM in the manner set out in CPLR Article 14.

## SEVENTH COUNTERCLAIM
### (For Contribution by UniCredit)

280.    Defendant incorporates by reference its pleadings in Paragraphs 101-213 above.

281.    If plaintiff BNYM has a claim herein sounding in negligence (as pleaded in Count II of the Complaint) or in any respect based on alleged tortious conduct by defendant, which claim defendant disputes both as a matter of law and on the factual merits, then UniCredit is subject to liability for damages for the same injury caused to BNYM, and defendant is entitled to contribution from UniCredit in the manner set out in CPLR Article 14.

**WHEREFORE** Defendant Textron Business Services, Inc. prays for judgment:

(a) Dismissing the Complaint in all respects;

(b) Granting defendant the remedy of an Accounting of the scope described in the First Counterclaim;

(c) Awarding defendant its unpaid Servicing Fees, with contractual interest, as set forth in the Second and Third Counterclaims and declaring defendant's right to payment of such fees going forward;

(d) Awarding defendant such damages as are proved at trial with respect to the Fourth and Fifth Counterclaims;

(e) Should either plaintiff obtain a recovery herein, then awarding defendant contribution from the other plaintiff in accordance with CPLR Article 14 as sought by the Sixth and Seventh Counterclaims; and

(f) Awarding defendant such other, further or alternative relief as the Court may deem just and proper.

Dated:   New York, New York
         September 7, 2011

                    ALLEGAERT BERGER & VOGEL LLP

                    By: _____
                        Christopher Allegaert (callegaert@abv.com)
                        James A. Beha II (jbeha@abv.com)

                    111 Broadway, 20th Floor
                    New York, New York 10006
                    (212) 571-0550

                    Attorneys for Defendant
                    Textron Business Services, Inc.

John W. McClelland
(jmcclelland@armstrongteasdale.com)
Armstrong Teasdale, LLP
2345 Grand Blvd., Suite 2000
Kansas City, MO 64108-2617
(816) 221-3420

Of Counsel.

<u>Annexed Exhibits</u>

A.     Master Agent Security Agreement ("MASA")

B.     BNYM's December 2008 UCC § 9-620 Notice

C.     2006-1 Securitization Flow of Funds Chart